William M. Audet (CA State Bar #117456)
waudet@audetlaw.com
Mariana S. Cole (CA State Bar #269939)
mcole@audetlaw.com
Audet & Partners, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: (415) 568-2555
Facsimile:  (415) 568-2556

Scott A. Kamber (*pro hac vice*)
skamber@kamberlaw.com
David A. Stampley (*pro hac vice*)
dstampley@kamberlaw.com
KamberLaw, LLC
100 Wall Street,  23rd Floor
New York, New York 10005
Telephone:  (212) 920-3072
Facsimile:  (212) 202-6364

Interim Class Co-Counsel

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: GOOGLE ANDROID CONSUMER PRIVACY LITIGATION | No. M 11-02264 JSW<br>MDL No. 2264 |
| This Document Relates to:<br>ALL CASES | Member Cases:<br>No. C 11-02157-JSW<br>No. C 11-02167-JSW<br>No. C 11-02230-JSW<br>No. C 11-02427-JSW<br>No. C 11-03688-JSW<br>No. C 11-04241-JSW<br>No. C 11-04429-JSW<br>No. C 11-04506-JSW<br>No. C 11-04573-JSW<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>1.  COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C § 1030; |

2. UNFAIR COMPETITION LAW, CAL. BUS. AND PROF. CODE § 17200;

3. RIGHT TO PRIVACY, CALIFORNIA CONSTITUTION, ART. I, SEC. 1;

4. COMPUTER CRIME LAW, CAL. PENAL CODE § 502;

5. INVASION OF PRIVACY ACT, CAL. PENAL CODE § 630;

6. NEGLIGENCE, AND

7. TRESPASS TO CHATTELS

In this first amended consolidated class action complaint ("Complaint"), the persons designated below as Plaintiffs ("Plaintiffs"), each on his or her own behalf and, collectively, on behalf of all others similarly situated (the putative "Class"), make the following allegations against Google, Inc. ("Google"), AdMob, Inc. ("AdMob"), and AdWhirl Inc. ("AdWhirl") based on each Plaintiff's personal knowledge of his or her own acts and observations and, otherwise, upon information and belief based on investigation of counsel. To the extent the Complaint refers to actions directed at Plaintiffs, such allegations also refer to actions directed at the Class Members as well.

## I. NATURE OF CASE

1.     Plaintiffs and similarly situated Class Members were victims of privacy violations and unfair business practices engaged in by Defendants that harmed their privacy, security and financial interests.

2.     Each of the Defendants gained unauthorized access to, and engaged in unauthorized use of, Plaintiffs and Class Members' mobile devices, on which Google's Android Operating System ("AOS") is installed. The AOS is Google provided computer code common to the operation of all Android mobile telephones ("Android Mobile Phones") and other Android mobile devices.

3.     Google designed the Android operating system for mobile phones with one or more features specifically to enable and promote the taking of Plaintiffs' and Class Members' personal information so as to further monetize, for Defendants' benefit, the advertising potential

of Android-based devices and to advance Google's revenue model in the wireless/mobile marketplace. Google plays a dual role in the operation of the Android ecosystem that it created: Google acts as both the operator and designer of the AOS, as well as providing an advertising placement service for the Apps that it hosts in the Android Market.

4.     During the Class Period, each of the Plaintiffs installed certain application software ("Apps"). Unbeknownst to Plaintiffs and Class Members, certain Apps collected personal data from their Android Mobile Phones and shared this data with Defendants and third parties. The personal data that was collected was transmitted to third parties such as Defendants for purposes wholly unrelated to the use and functionality of their Android mobile phones or the Apps in which the data collection code was hidden. This sharing was made possible by the AOS and computer code provided for the Apps by Defendants. This collection and sharing was done with the knowledge, consent and participation of Defendants—but not with the knowledge or consent of Plaintiffs.

5.     Certain data, such as geolocation information, was collected by the AOS itself and sent to Google regardless of whether Plaintiffs installed any Apps.

6.     In addition to Defendants' collection of Plaintiffs' and Class Members' personal data, Google also failed to fully advise Plaintiffs and Class Members that by using their Android phones or in downloading Apps, their data would be subjected to collection and tracking by other third parties, and failed to provide Plaintiffs and Class Members with an appropriate mechanism to prevent the improper collection and sharing of their data by Defendants and other third parties.

7.     None of the Plaintiffs were made fully aware of or otherwise consented to the collection of this data.

8.     The information collected included, but was not limited to: a Plaintiff's precise home and workplace locations and current whereabouts; several universally unique device identifiers ("UUIDs") assigned to Plaintiffs' Android mobile phones; other device-specific data that could only be useful to Google and third parties for purposes of "device fingerprinting;" (ie. the creation of a back-up unique identifier to engage in tracking of a particular device ); along

with personal information about Plaintiffs such as gender and age, which functions Plaintiff performed on Apps, search terms entered, and selections of movies, songs, or restaurants.

9.    In addition, the data collection and tracking activity by Defendants required Defendants to install and run hidden code on Plaintiffs and Class Members Android mobile devices.

10.    The effect of this surreptitious use of resources had a real cost to Plaintiffs and other Class Members through the consumption and use of battery life and file storage of Plaintiffs' Android mobile phone.

## II. JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction over this action pursuant to: (a) Title 28, United States Code, Section 1331; and (b) The Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. Sections 1332(a) and (d), because the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, and more than two thirds of the members of the Class are citizens of states different from those of Defendants.

12.    Under CAFA, the federal courts have exclusive jurisdiction over all class actions with an amount in controversy in excess of $5,000,000. Here, the statutory claims alone have a value far in excess of that amount, which establishes jurisdiction.

13.    Venue is proper in this District under Title 28, United States Code, Sections 1391(b) and (c) because Defendants' improper conduct alleged in this Complaint occurred in, was directed from, and/or emanated from this judicial district. Defendants Google, AdWhirl and AdMob have their principal places of business in this district.

## III. STANDING

14.    Each of the Plaintiffs has standing to bring this case under Article III of the United States Constitution.

15.    Plaintiffs have standing by virtue of alleging concrete, tangible and non-speculative injuries in fact, arising from violations of federal and state statutes and/or the violation of constitutional rights. The harms they allege, including the invasion of privacy and the invasion of both statutory and constitutional rights, are traceable to Defendants' actions.

Further, the relief they seek, encompasses both monetary and injunctive remedies due to actual harm and injury to plaintiffs.

16. Plaintiffs have each suffered harm and economic injury as a direct result of each Defendants' actions and practices of collecting, compiling and distributing Plaintiffs' personally identifiable information, including geolocation data and UUID's.

17. The data collected from Plaintiffs and Class Members is property and has an independent, quantifiable market value to both Plaintiffs and Defendants.

18. As a result of Plaintiffs and Class Members' data being disseminated, the value and demand for such data by marketing and research companies that would have paid a certain amount for the data has now been diminished and Plaintiffs and Class Members have lost the opportunity to sell this information for full market value should they decide to do so.

19. As with any form of property, the owners, such as Plaintiffs and Class Members, suffered a concrete, measurable damage and injury the exact amount of which shall be provided by Plaintiffs through expert opinion.

20. Additionally, the scope of the collection and transmission of geolocation data back to Google, and the concomitant drain on Android Device resources, such as battery life, was not fully disclosed to class members. Specifically, Google claims that users may "opt-in" to having their location tracked but in doing so will be "anonymized". This, however, is not the case because even when geolocation services are turned off, Android Devices continue to store geolocation data on the Android Devices, which are later transmitted to Google the next time geolocation services are turned on. Further, Plaintiffs and Class Members were not "anonymized" because the location data that was sent back to Google is directly tied to a users' UUID.

21. Geolocation data was collected multiple times per minute and the information collected was transmitted back to Google several times an hour. Google also used the system resources of Plaintiffs and Class Members to transmit detailed information back to itself about nearby wifi networks.

22.     Each Defendant's culpability for unreasonable and unexpected battery consumption and diminution of battery life can be discerned through mobile network carriers' diagnostic data collection, most of which was done through Carrier IQ software.

23.     Carrier IQ provides software that mobile network service providers embed or pre-load on the mobile phones they sell. The software is designed to provide service diagnostic data to the carriers. Carrier IQ diagnostic details include measurement of battery charge level, drain, and charge cycles and contemporaneous documentation of specific application events and functions.

24.     Such measureable loss without adequate compensation is sufficient to satisfy Article III standing for injury.

## IV. PARTIES

**A.     Named Plaintiffs**

25.     Plaintiff JULIANN KING is an adult individual who is a citizen and a resident of Thousand Oaks, California. At all relevant times herein, Plaintiff King owned and used an Android mobile device, and used Apps she downloaded from the Android Market, including Dictionary.com Ad-Free, Foursquare, Groupon, MovieFone, and UrbanSpoon.

26.     Plaintiff JULIE BROWN is an adult individual who is a citizen and a resident of Rochester, Michigan. At all relevant times herein, Plaintiff Brown owned and used an Android mobile device, and used the Flashlight App integrated into her AOS.

27.     Plaintiff THEODORE SPRADLEY is an adult individual who is a citizen and a resident of Farmers Branch, Texas. At all relevant times herein, Plaintiff Spradley owned and used an Android mobile device, and used Apps he downloaded from the Android Market, including Advanced Task Killer and Pandora.

28.     Plaintiff KENDRICK COCHRAN is an adult individual who is a citizen and a resident of Vallejo, California. At all relevant times herein, Plaintiff Cochran owned and used an Android mobile device, and used Apps he downloaded from the Android Market, including Advanced Task Killer and Pandora.

29.     Plaintiff NICHOLAS LAWRENCE is an adult individual who is a citizen and a resident of Cedar Park, Texas. At all relevant times herein, Plaintiff Lawrence owned and used an Android mobile device, and used Apps he downloaded from the Android Market, including Angry Birds.

30.     Plaintiff SID LAJZER is an adult individual who is a citizen and a resident of Round Rock, Texas. At all relevant times herein, Plaintiff Lajzer owned and used an Android mobile device, and used the Flashlight App integrated into his AOS.

31.     Plaintiff BRYAN HICKS is an adult individual who is a citizen and a resident of Stevenson, Alabama. At all relevant times herein, Plaintiff Hicks owned and used an Android mobile device, and used Apps he downloaded from the Android Market, including Pandora.

32.     Plaintiff BEVERLY LEVINE is an adult individual who is a citizen and a resident of Dallas, Texas. At all relevant times herein, Plaintiff Levine owned and used an Android mobile device, and used Apps she downloaded from the Android Market, including Pandora.

33.     Plaintiff JOAN SMITH is an adult individual who is a citizen and a resident of Birmingham, Alabama. At all relevant times herein, Plaintiff Smith owned and used an Android mobile device, and used Apps she downloaded from the Android Market, including Pandora.

34.     Plaintiff MARITSA URIAS is an adult individual who is a citizen and a resident of Dallas, Texas. At all relevant times herein, Plaintiff Urias owned and used an Android mobile device, and used Apps she downloaded from the Android Market, including Pandora.

35.     Plaintiffs JAMES AND JESSICA JEFFERYS are adult individuals who are citizens and residents of Lake Worth, Florida. At all relevant times herein, Plaintiffs James and Jessica Jefferys owned and used an Android mobile device, and James Jefferys used Apps he downloaded from the Android Market, including Buddhist Dhammapada.

36.     Plaintiff PHILLIP HALL is an adult individual who is a citizen and a resident of Addison, Texas. At all relevant times herein, Plaintiff Hall owned and used an Android mobile device, and used Apps he downloaded from the Android Market, including Advanced Task Killer and Pandora.

37.     Plaintiff M.G. is an individual less than 13 years of age who is a citizen of and residing in the state of Wisconsin. At all relevant times herein, Plaintiff M.G. used an Android mobile device.

**B.     Defendants**

38.     Defendant, GOOGLE, INC. is a company organized and existing under the laws of the State of Delaware, with its principal place of business located in Mountain View, California.

39.     Google provides the AOS for many popular mobile computing devices. Google also provides advertising services to App developers running Apps on mobile devices using Google's AOS.

40.     Google conducts substantial business throughout the entire United States by advertising and through the extensive use of distribution channels that deliver and sell goods and services to consumers. In 2010, 96 percent of Google's $29 billion in revenue was generated through advertising. Google is the owner of Defendant AdMob Inc., a mobile advertising network. Google also operates ad network DOUBLECLICK, and provides analytics services through GOOGLE ANALYTICS. Neither Doubleclick nor Google Analytics are operated as separate companies but are a part of Google. Thus, neither is named herein as a separate defendant.

41.     Defendant ADMOB, INC. ("AdMob") is a Delaware corporation with its principal place of business in San Mateo, California. AdMob was acquired by Google, Inc. in 2009. AdMob purports to be "the world's largest mobile advertising marketplace" offering "both advertisers and publishers the ability to target and personalize advertising to their customers in 150 countries."

42.     Defendant ADWHIRL, INC. ("AdWhirl") is a Delaware corporation and subsidiary of AdMob, Inc., with its principal place of business in Menlo Park, California. AdWhirl operates a platform allowing advertisers to dynamically switch campaigns from one ad network to another.

43.     Defendants AdMob, and AdWhirl, along with Google Analytics and numerous third party advertising and analytics companies, are third party affiliates of App developers and may also be referred to herein as Application Developer Affiliates or Affiliates. AdWhirl, AdMob and Google Analytics each provided specialized code to Google Application Developers in the form of SDKs (as defined below), which Defendants AdMob and AdWhirl used to track users who eventually download Apps from the Android Market.

## V. ALLEGATIONS OF FACT

**A.     Background**

44.     Google designed Android, a computer operating system for mobile devices, as an "open" system that could easily be used and adapted by manufacturers of mobile phones and developers of Apps for mobile phones.

45.     On October 22, 2008, Google launched the Android Market, an online software store developed by Google for Android devices. An App called "Market" is preinstalled on most Android devices and allows users to browse and download other Apps developed by third-party developers, hosted on the Android market. Users can also search for and read detailed information about Apps from the Android market website.

46.     Apps available in the Android Market relate to all aspects of Consumers' personal and business lives, with categories consisting of: Books & Reference, Business, Comics, Communication, Education, Entertainment, Finance, Health & Fitness, Libraries & Demo, Lifestyle, Live Wallpaper, Media & Video, Medical, Music & Audio, News & Magazines, Personalization, Photography, Productivity, Shopping, Social, Sports, Tools, Transportation, Travel & Local, Weather, Widgets, game-specific categories of Arcade & Action, Brain & Puzzle, Cards & Casino, Live Wallpaper, Racing, Sports Games, and Widgets.

47.     Numerous Apps available from the Android Market are created by developers known as "Google Application Developers". Google Application Developers are application developers who entered into an "Android Market Developer Distribution Agreement," with Defendant Google. There are several hundred thousand Apps available at the Android Market, some of which are free and some of which are sold for a fee, by Google Application Developers.

48.     Google creates the technology environment to enable Defendants to access substantial information about Plaintiffs. First, Google creates the AOS, which not only "runs" the device, but also performs the functions that routinely send Plaintiffs' current geolocation coordinates to Google itself. Second, Google has designed the AOS to include software "hooks" which allow specific information about an Android Mobile Phone, and what a user is doing with the phone, available to an App running on the phone. Third, so that an App developer can take advantage of these hooks, Google provides App developers a software development kit ("SDK") that includes the code (application programming interfaces, or "APIs") needed in an App to take advantage of the operating system hooks.

49.     An SDK is typically a set of development tools which allow for the creation of applications for a certain software package, software framework, hardware platform, computer system, video game console, operating system, or similar platform. It may be something as simple as an application-programming interface (API) in the form of files interfacing with a particular programming language or include sophisticated hardware to communicate with a certain embedded system. SDKs are provided for free to encourage Application Developers to use the code provided by third party affiliates such as AdMob and AdWhirl.

50.     Defendants provided App Developers with specific API code to be embedded in Plaintiffs' Apps in order to accomplish the data collection sought by Defendants. Depending on the Defendant, the purposes accomplished by the code Defendants embedded in the Apps included collection of Plaintiffs' information to identify and track Plaintiffs' activity and location data for use in building behavioral profiles of Plaintiffs for purposes of ad-targeting, and to compile analytics data regarding Plaintiffs' uses of Apps.

51.     An App developed using Google's SDK will only function on Android Devices and can only interact with the AOS and features in the ways permitted by Google.

52.     Google controls the process for the development software as well as influencing developers to use Google's SDK, and providing highly detailed guidelines for App development.

53.     Google exercises substantial control over what Apps may be offered by the Android Market. No developer is permitted to sell an App in the Android Market without entering into Google's form AOS Developer Agreement.

54.     Although Google considers its Android Market to be an Open Distribution Channel for App developers, Google removes approximately one percent of all Apps from its Market for violations of terms of the AOS Developer Agreement. Further, after a user downloads an App, Google maintains control by requiring that the end-user license agreement for every third-party App include a clause giving Google the ability to step into the shoes of the App developer to control the user's use of the App.

55.     Although Google requires Android Apps to notify users of some of the data sources the App intends to access on their devices before an App is downloaded, Google does not require Apps to ask permission to access some forms of the device ID, or to send it to outsiders.

56.     Google is lax in the oversight and policing of the Android Market and only rarely takes steps to remove Apps both from its Market and from users' devices after they have been posted on the Android Market.

57.     On Android mobile phones, the Android operating system stores unique information identifying each individual device, including a UUID. Each UUID is stored in and linked to the particular Android Mobile Phone and cannot be changed or erased. Each UUID is unique. Thus, because of its persistence and uniqueness, when it is collected it makes all data collected about Plaintiffs and Class Members from the Android Mobile Phone personally identifiable information.

58.     Plaintiffs discovered that Defendant Google and numerous third parties, including AdMob and AdWhirl, were monitoring Plaintiffs by using code they hid in the Apps installed on Plaintiffs' Android mobile phones. This hidden code provided third parties with personal data about each of the Plaintiffs and Class Members is considered spyware. "Spyware" includes "any type of software that is surreptitiously installed on a computer and, without the consent of the user [to] collect information from a computer…" *FTC v. Pricewert*, Case. No. C-

09-2407 (RMW) (N.D. Cal.), Order Appointing Temporary Receiver, June 15, 2009 (Dkt. 38). Through this spyware, Defendants took identifiable and personal information from Plaintiffs and Class Members' mobile phones without Plaintiffs and Class Members' knowledge and express consent.

59.    The information taken included numerous forms of unique identifiers, precise data pinpointing Plaintiffs' geographic locations, App activity such as searches and music/video selections, as well as information regarding age and gender. This information was not needed for the functioning of the Apps or to display advertising.

60.    Plaintiffs and Class Members did not provide informed consent to third parties (including Defendants AdWhirl and AdMob) collecting their personal and personally identifiable information, nor did they consent to such third parties sharing it by, between, and amongst Defendants or with other third parties.

61.    Since the information was transmitted unencrypted to Defendants, these unsecured transmissions were particularly inappropriate given the likelihood that many users of such Apps are minors, like Plaintiff M.G. Such unencrypted transmission also violated the standards recommended by the U.S. Department of Commerce' Guidelines on Cell Phone and PDA Security.

62.    Since there was never full or accurate disclosure by any of the Defendants, Plaintiffs and Class Members did not expect or expressly consent to Defendants' tracking when they purchased their Android mobile phones.

**B.    Personal Information**

63.    "Personal Information" is information about a particular person and includes "Personally Identifiable Information" (or "PII"), which includes geolocation data as well as the following data identified by the Federal Trade Commission:

> Individually identifiable information from or about an individual [consumer] including, but not limited to: (a) a first and last name; (b) a home or other physical address, including street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name that reveals an individual's email address; (d) a telephone number; (e) a Social Security Number; (f) a persistent identifier, such as a customer

number held in a "cookie" or processor serial number, that is combined with other available data that identifies an individual; or (g) any information that is combined with any of (a) through (f) above.

## Geolocation Information

64.     Google routinely acquires information about the precise geographic locations of Android Mobile Phone users, including Plaintiffs. This geolocation information is highly detailed, pinpointing Plaintiffs' locations with an accuracy of a matter of a few feet. The AOS collects data about locations of users regardless of whether a particular App is running.

65.     Specifically, there are two files in an Android phone that are responsible for storing location data of users—"cache.cell," which holds a list of the last 50 cell phone towers a users' handset has communicated with, and "cache.wifi." These files are limited in the amount of location data they store and are rewritten when each folder reaches its max.

66.     Regardless of when the list of locations is rewritten, the Android device tracks users' locations and in doing so, compiles information that creates a thorough record of where users live, work, attend school, seek entertainment, or worship based on frequencies and types of locations recorded at particular times of day.

67.     Google purportedly allows users to "opt-in" to having their geolocation tracked and purports that once a user "opts-in", they are "anonymized". This, however, is not the case for the following reasons:

> a)     Even when geolocation services are turned off, Android Devices continue to store geolocation data on the Android Devices, which are later transmitted to Google the next time geolocation services are turned on; and
>
> b)     Google falsely claims that once users opt-in, they will be "anonymized" because any location data that is sent back to Google location servers is tied and/or traceable to a specific user through the use of UUIDs.

**Data Collected From Apps**

68.    As noted by the online advertising industry organization, the Network Advertising Initiative (NAI):

> While advertising networks do collect data on consumers who view their advertising, this data is often anonymous. However, profiles derived from tracking consumers' activities on the Web can be linked or merged with "personally identifiable information" (PII). It can also be combined with offline purchase data or information collected via a survey, census, or registration form.

*FAQs*, NAI, available at http://www.networkadvertising.org/managing.

69.    It is contrary to industry standards to "de-anonymize" a consumer's profile data by inferring identity from multiple data points or linking anonymous data with personally identifiable information, unless the party doing so has obtained the consumer's explicit consent.

70.    The information collected by Defendants through the code embedded in Plaintiffs' Apps, includes personally identifiable information as well as information about Plaintiffs' mobile phone device settings and characteristics which, taken together, are increasingly used by tracking companies for "device fingerprinting," that is, constructing a universally unique identifier by combining several elements that remain constant and which, when combined, are unique.

71.    The specific information particular Defendants collect through their code embedded in particular Apps is detailed further below and includes the following types of information:

a)    *Information about or identifying user:* UUID, precise geolocation, age, gender, zip code and country of residence; in addition, a number of Apps assign their own unique identifiers to individual Plaintiffs and share these unique identifiers with Defendant advertisers. In one case detailed below, the Buddhist Dhammapada App shared a unique identifier it assigned to users with two separate third parties, Defendant AdMob and Google's DoubleClick.

b)     *Information user App activity*: name, identifier, or web address of App; user's search term (*e.g.*, restaurant, food type, store) or selection (*e.g.*, song, artist, book, author) and the web page address on the App's server with which the user is interacting.

c)     *Device characteristics:* AOS version/build ID, language setting in browser; device make/model; and screen color depth and/or resolution.

d)     *Tracking Management:* pixel tag ID (*i.e.*, Defendant's ID assigned to an invisible tracking code embedded in a web page associated with an App) and other identifier codes used by a Defendant or an App to retrieve analytics data from a Google Analytics account.

72.     As set forth below, each of the Defendants (directly or through entities they own or control), captured data, including the following specific examples, through the use of specific API code they embedded in the Apps which follow:

***Google Analytics***

73.     Through the FourSquare App, Google Analytics collected the following information: user geographic position (lat./lon.), URL/title for current page, language, screen color depth and/or resolution, language (browser), pixel tag ID, tracker's Google Analytics account ID, and tracking code version.

74.     Through the Groupon App, Google Analytics collected the following information: unique user ID assigned by Groupon and stored in cookie, URL/title for current page, information custom-defined by tracker, language, screen color depth and/or resolution, language (browser), type of event being tracked (e.g.; event, transaction, items), pixel tag ID, tracker's Google Analytics account ID, and tracking code version.

75.     Through the UrbanSpoon App, Google Analytics collected the following information: URL/title for current page, and the identity of the App (name, ID, web address).

76.     Through the Dictionary.com Ad-Free App (fee required), Google Analytics collected the following information: URL/title for current page, and tracker's Google Analytics account ID.

***DoubleClick; AdMob; and AdWhirl***

77.     Through the UrbanSpoon App, DoubleClick collected the following information: search term entered by user.

78.     Through the Advanced Task Killer App, DoubleClick collected the following information: identity of App (name, ID, web address), network, and user's audio settings.

79.     Through the Angry Birds App, DoubleClick collected the following information: identity of App (name, ID, web address).

80.     Through the Pandora App, DoubleClick collected the following information: user age, user gender, user zip code, media artist selected by user, phone make and/or model, and Android version/build ID.

81.     Through the Flashlight App, integrated into the AOS on Android Mobile Telephones manufactured by HTC, AdMob collected the following information: identifier codes of unknown content.

82.     Through Buddhist Dhammapada App, AdMob collected the following information: application ID, and Android operating system version.

83.     Through Buddhist Dhammapada App, DoubleClick collected information from Plaintiffs that included a unique identifier assigned to Plaintiff, which DoubleClick then shared with Defendant AdMob.

84.     Through Buddhist Dhammapada App, AdWhirl collected the following information: UUID, application ID, and country.

85.     DoubleClick and AdMob—two separate third parties to whom Plaintiffs gave no tracking consent—shared the tracking ID with each other. This allowed them to augment and coordinate their tracking and profiling of Plaintiff across their substantial networks. This coordination and tracking was particularly egregious due to the highly sensitive and personal nature of an App that deals with religious subject matter.

**C.      Harms Suffered**

<u>**Collection And Sharing of Valuable Personal information**</u>
<u>**Without Appropriate Notice or Consent**</u>

86.     Plaintiffs did not receive full or accurate notice of the collection of personal information data or geolocation information.

87.     Although Google recommends users should install only applications they trust and provides assurances to users that their privacy and security are protected since suspicious Apps can be uninstalled at any time, Google fails to address how users can make informed decisions about which Apps are trustworthy and which are not.

88.     Additionally, although Google offers an "opt-in" approach to having user's geo-locations tracked, Google misrepresents that users will be "anonymized" and does not alert users to the fact that the geolocation tracking, is in fact, linked back to each users UUID.

89.     The data collected from Plaintiffs and Class Members is property and has an independent, quantifiable market value to both Plaintiffs and Defendants.

90.     Plaintiffs have each suffered harm and economic injury as a result of Defendants' actions of surreptitiously compiling and disseminating personal information and geolocation information.

91.     The collected personal information is quantifiable and thus is of actual value to Plaintiffs.

92.     As a result of Plaintiffs' and Class Members' data being disseminated, the value and demand for such data by marketing and research companies that would have paid a certain amount for the data has now been diminished and Plaintiffs and Class Members have lost the opportunity to sell such data for full market value.

93.     Personal information clearly has economic value based on the fact that such information is often sold for marketing and research purposes.

94.     Plaintiffs and Class Members have suffered economic loss as a result of Defendants' surreptitious acquisition, compilation, and dissemination of their personal information and geolocation history, due to the fact that Plaintiffs and Class Members were not

provided financial compensation for the value of their personal information. Additionally, the value and demand for such information for marketing and research purposes is now diminished as a result of Defendants' dissemination of the information and Plaintiffs and Class Members have lost the opportunity to profit from such information at full market value.

### Improper Resource Utilization

95.     The acquisition of location data on Android devices is accomplished with GPS satellite position data. The acquisition of this data is resource intensive and consumes battery life on Android mobile phones; in fact, a recommended method for resource conservation is to minimize GPS use.

96.     The rate at which battery charge was diminished on the Android mobile phones as a result of Defendants' actions was material to Plaintiffs, particularly given the power resource constraints on the Android mobile phone.

97.     Not only did Defendants' actions cause Plaintiffs' Android mobile phone batteries to discharge more quickly, rendering the Android mobile phones less useful given their unexpected power consumption, but they interrupted Plaintiffs' and Class Members' services.

98.     Further, because Defendants' actions caused the batteries of Plaintiffs' mobile phones to discharge more quickly, Defendants reduced the utility of those mobile phone batteries. This is because each charge and discharge cycle causes chemical changes in the active battery material, diminishing the battery's storage capacity, requiring ever more frequent recharging.

### VI. CLASS ALLEGATIONS

99.     Pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), Plaintiffs bring this action as a class action, on behalf of themselves and all others similarly situated as members of the following proposed class (the "Class"):

> All individuals residing in the United States who used mobile devices that operate with an Android operating system and from whom information about them and/or their mobile device was acquired without their consent by Defendants and/or on Defendants behalf.

100.    On behalf of the Class, Plaintiffs seek equitable relief, damages and injunctive relief pursuant to:

        a)        Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

        b)        California Business and Professions Code § 17200;

        c)        Right to Privacy; California Constitution, Art. I, Sec. 1;

        d)        California's Computer Crime Law, Penal Code § 502;

        e)        California's Invasion Of Privacy Act, Penal Code § 630;

        f)        Negligence; and

        g)        Trespass to Chattels

101.    **Persons Excluded From The Class:** Specifically excluded from the proposed Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

102.    **Numerosity:** The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains tens of thousands of members. The precise number of Class Members is unknown to Plaintiffs. The true number of Class Members is known by Defendant Google and is discernable from Google's records.

103.    **Commonality:** Pursuant to Federal Rules of Civil Procedure, Rule 23(a)(2) and Rule 23(b)(3) are satisfied because there are questions of law and fact common to Plaintiffs and the Class, which common questions predominate over any individual questions affecting only individual members, the common questions of law and factual questions include, but are not limited to:

        a)        What was the extent of Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users'

personal information including, but not limited to, UUIDs and geolocation?

b)     What information did Defendants' collect from their business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' personal information including, but not limited to, UUIDs and geolocation, and what did they do with that information?

c)     Whether users, by virtue of their downloading the application, had pre-consented to the operation of Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' UUIDs and other personal information;

d)     Was there adequate notice, or any notice, provided to Plaintiffs and Class Members of the operation of Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' personal information including, but not limited to, UUIDs and geolocation and the sharing of this data with third parties?

e)     Was there reasonable opportunity provided to Plaintiffs and Class Members to decline the operation of Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' personal information including, but not limited to, UUIDs and geolocation?

f)     Did Defendants' business practices of obtaining, collecting, monitoring, sharing and remotely storing users' UUIDs, and other personal information, disclose, intercept, and transmit personally identifying information, or sensitive identifying information, or personal information in violation of state and federal law?

g)     Whether Defendants devised and deployed a scheme or artifice to defraud or conceal from Plaintiffs and the Class Members Defendants' ability to, and practice of, intercepting, accessing, sharing and manipulating, for

their own benefit, personal information, and tracking data from Plaintiffs' and the Class Members' personal mobile devices?

h)      Whether Defendants engaged in deceptive acts and practices in connection with their undisclosed and systemic practice of transmitting, accessing and/or disclosing unique identifiers, tracking data, and personal information on Plaintiffs' and the Class Members' personal mobile device and used that data to track and profile Plaintiffs' and the Class Members' Internet activities and personal habits, proclivities, tendencies, and preferences for Defendants' use and benefit?

i)      Did Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' data violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

j)      Did Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' UUIDs violate California's Business and Professions Code § 17200?

k)      Did Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' personal information including, but not limited to, UUIDs and geolocation violate California's Right to Privacy, California Constitution, Art. I, Sec. 1?

l)      Did Defendants' business practices of transmitting, accessing, collecting, monitoring, and remotely storing users' personal information, including, but not limited to UUIDs and geolocation violate California's Computer Crime Law, Penal Code § 502

m)      Did Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' personal information including, but not limited to, UUIDs and geolocation violate California's Invasion of Privacy Act, Penal Code § 630?

n) Were Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing Plaintiffs and Class Members' personal information including, but not limited to, UUIDs and geolocation negligent?

o) Did Defendants' business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing Plaintiffs and Class Members' personal information including, but not limited to, UUIDs and geolocation involve Trespass to Chattels?

p) Whether Plaintiffs and Class Members have sustained damages as a result of Defendants' conduct, and, if so, what is the appropriate measure of damages?

q) Whether Plaintiffs and Class Members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

r) Whether Plaintiffs and Class Members are entitled to punitive damages, and, if so, in what amount?

104. **Typicality:** Plaintiffs' claims are typical of the claims of all of the other members of the Class, because their claims are based on the same legal and remedial theories as the claims of the Class and arise from the same course of conduct by Defendants.

105. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in consumer class action litigation. Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

106. **Superiority:** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against the Defendants. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them.

107.   In the alternative, the Class may also be certified because:

    a)   the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members that would establish incompatible standards of conduct for the Defendants;

    b)   the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    c)   Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## VII. CLAIMS FOR RELIEF

108.   Based on the foregoing allegations, Plaintiffs' claims for relief include the following:

**FIRST CLAIM FOR RELIEF**
**Violation of the Computer Fraud and Abuse Act**
**18 U.S.C § 1030, *et seq.***
**Plaintiffs, on behalf of the Class, Against Defendants**

109.   Plaintiffs incorporate the foregoing by reference as if fully set forth herein.

110.   The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, referred to as "CFAA," regulates fraud and related activity in connection with computers.

111.   The CFAA makes it unlawful to intentionally access a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, thereby obtaining information from such a protected computer, within the meaning of U.S.C. § 1030(a)(2)(C).

112.     Each of Plaintiffs and Class Members' mobile devices on which the Android operating system is installed is a "protected computer ... which is used in interstate commerce and/or communication" within the meaning of 18 U.S.C. § 1030(e)(2)(B).

113.     Defendants violated 18 U.S.C. 1030 by intentionally accessing Plaintiffs' and Class Members' mobile devices without authorization or by exceeding authorization, thereby obtaining information from such a protected computer.

114.     The CFAA, 18 U.S.C. § 1030(g) provides a civil cause of action to "any person who suffers damage or loss by reason of a violation of CFAA."

115.     The CFAA, 18 U.S.C. § 1030(a)(5)(A)(i) makes it unlawful to "knowingly cause the transmission of a program, information, code, or command and as a result of such conduct, intentionally cause damage without authorization, to a protected computer," of a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

116.     Defendants violated the CFAA because the Android operating system and associated APIs knowingly allowed the transmission of code or commands, and/or Defendants surreptitiously embedded tracking code unrelated to the advertised functioning of an App, to Plaintiffs and Class Members' mobile devices, which code or commands accessed the Personal Information of Plaintiffs and Class Members and transmitted such information to Defendants and other third parties, without the knowledge, consent or authorization of Plaintiffs.

117.     Defendants violated 18 U.S.C. § 1030(a)(5)(A)(i) by knowingly causing the transmission of a command to be downloaded to Plaintiffs and Class Members' mobile devices, which are protected computers as defined above, and intentionally causing damage without authorization.

118.     Defendants violated 18 U.S.C. § 1030(a)(5)(A)(ii) by intentionally accessing Plaintiffs' and Class Members' protected mobile devices without authorization, and as a result of such conduct, recklessly caused damage to Plaintiffs and Class Members' mobile devices by impairing the integrity of data and/or system and/or information.

119.    Defendants violated 18 U.S.C. § 1030 (a)(5)(A)(iii) by intentionally accessing Plaintiffs and Class Members' protected computers without authorization, and as a result of such conduct, caused damage and loss to Plaintiffs and Class Members.

120.    Defendants intended to cause damage in that they knew or should have known that their conduct would consume Plaintiffs and Class Members' valuable computer assets and resources, as described more fully in Section entitled "Improper Resource Utilization" above.

121.    Defendants intended to access Plaintiff and Class Members' Personal Information, inasmuch as such access was accomplished through the execution of computer code and instructions specifically designed for such access, such as App code created using SDKs provided by AdMob and AdWhirl, which effectuated access to Plaintiffs and Class Members' computers by interacting with Google-provided APIs (application programming interfaces) specifically designed by Google to facilitate the retrieval of information from mobile devices.

122.    Defendants' conduct was without authorization and/or exceeding authorization.

123.    Plaintiffs and Class Members suffered damage by reason of these violations, as defined in 18 U.S.C. 1030(e)(8), by the "impairment to the integrity or availability of data, a program, a system or information," in that Defendants' conduct caused the condition, value and functionality of Plaintiffs and Class Members' mobile devices and their related computer resources to be impaired. See Section entitled, "Harms Suffered."

124.    Plaintiffs and Class Members have suffered loss by reason of these violations, as defined in 18 U.S.C. 1030(e)(11), by the "reasonable cost . . . including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." As described more fully above in Section entitled "Harms Suffered," as a result of Defendants' conduct, Plaintiffs and Class Members suffered costs incurred due to Defendants' utilization of their valuable computer resources, the diminution in value of their mobile devices, and the deprivation of the value of their information assets.

125.     Defendants' unlawful access to Plaintiff and Class Members' computers, use of their computer assets and resources, interruption of their services, and taking of their information was carried out through the same automated process, and resulted in an aggregated loss to Plaintiffs and Class Members of at least $5,000 within a one-year period.

126.     The aggregated losses to Plaintiff and Class Members amount to $5,000 or greater during a one-year period in that the battery life consumed by Defendants, and the concomitant diminution in the value of the mobile devices, can be discerned through discovery of Defendants' records and expert testimony. The Class consists of millions of individuals whose losses are a function of repeated, battery-affecting app events. When losses are aggregated across Plaintiffs and millions of Class Members, losses exceed $5,000 during any one-year period during the Class Period.

127.     Defendants' unlawful access to Plaintiffs' and Class Members' computers and electronic communications has caused Plaintiffs and Class Members irreparable injury. Unless restrained and enjoined, Defendants will continue to commit such acts. Plaintiffs and Class Members' remedy at law is not adequate to compensate them for these inflicted and threatened injuries, entitling Plaintiff and Class Members to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

128.     As a direct and proximate result of Defendants wrongful conduct, Plaintiffs and Class Members have suffered harm and are entitled to appropriate relief pursuant to 18 U.S.C. § 1030.

**SECOND CLAIM FOR RELIEF**
**Violation of California Business and Professions Code § 17200**
**Plaintiffs, on behalf of the Class, Against Defendants**

129.     Plaintiffs incorporate by reference all paragraphs previously alleged herein.

130.     California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

131.     Defendants' acts and practices as detailed herein constitute acts of unfair competition. Defendants have engaged in unlawful, unfair or fraudulent business acts and/or practices within the meaning of California Business & Professions Code, Section 17200, *et seq.* Defendants need only violate one of the three prongs to be held strictly liable.

132.     Defendants' unfair or deceptive practices occurred primarily and substantially in California. Decisions concerning the retention, safeguarding and the disclosure of user information were made in California as Defendant Google maintains all or a substantial part of its computer systems containing user information in California, and the disclosure of its users' information took place primarily and substantially in California.

## A.     Unlawful Business Acts and Practices

133.     Defendants have violated the "unlawful" prong of the UCL in that Defendants' conduct violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, California Business and Professions Code § 17500, *et seq.*, California Civil Code § 1750, *et seq.*, and California Penal Code, section 502. As a result, these claims may serve as predicate violations of the "unlawful" prong of the UCL.

134.     Plaintiffs reserve the right to identify additional provisions of the law violated by Defendants as further investigation and discovery warrants.

## B.     Unfair Business Acts and Practices

135.     Defendants have violated the "unfair prong of the UCL by improperly capturing, storing, and transmitting Plaintiffs and Class Members' Personal Information in unencrypted form, without Plaintiffs and Class Members' knowledge and consent.

136.     Defendants' acts and practices are unfair because they have caused harms as fully described in the section entitled, "Harms Suffered," which includes the devaluation of Plaintiffs and Class Member's personal property and the diminishing of battery life resources.

137.     Plaintiffs have suffered material disadvantage regarding their interests in the privacy, confidentiality, and security of their Personal Information, in which they have a property interest, and have lost money, including the difference between what they paid for their

mobile devices and the devaluation of their mobile devices as a result of Defendants' privacy-invading and resource-consuming functions.

**C.  Fraudulent**

138.  Defendant Google violated the "fraudulent" prong of the UCL by explicitly representing in their privacy agreement that they would not provide users' personal information to third parties without consent and omitting that such information could be accessed by third parties. Defendant Google used this misrepresentation to induce users to purchase the Android devices and Apps offered in the Android Market. Defendants then knowingly transmitted that information to third parties without authorization and allowed Developers and Developer Affiliates to access such information.

139.  Defendants' unfair or deceptive practices occurred primarily and substantially in California. Decisions concerning the retention and safeguarding the disclosure of user information were made in California, Defendant Google maintains all or a substantial part of its computer systems containing user information in California, and the disclosure of its users' information took place primarily and substantially in California.

140.  Google had a duty to fully disclose the privacy and security characteristics of the mobile devices and operation with the Apps sold in the Google Android Market because it (i) knew or should have known about such characteristics at the time that Plaintiffs and members of the Class purchased the product, inasmuch as Google designed the Android operating system and created the Android App Market to promote third-party tracking and continued to upgrade its operating system in ways that maintain the ability of third-party trackers to continue their unauthorized tracking and interception of electronic communications; (ii) had exclusive knowledge of these material facts, which information was not known to Plaintiffs; and (iii) made a partial representation regarding Plaintiffs and Class Members' ability to opt-in or consent to location tracking services and anonymization of such data but failed to disclose that users are tracked by their UUID's and usage of Apps, often linked to other identifiers unique to Plaintiffs, regardless of the use of the privacy, location and security tools on their mobile

devices, and that this information is tied to their mobile devices in such a way that the information is not "anonymized" at all.

141.   Further, Google failed to fully disclose the material facts that the Android App Market, the Apps, and Google's relationships with app developers and their Affiliates was designed to foster the unauthorized taking of and profiting from Plaintiffs and Class Members' Personal Information.

142.   As a proximate and/or direct result of the unlawful, unfair, and fraudulent business practices of Defendants, Plaintiffs and the Class have suffered injury-in-fact and have lost money and property—specifically, their Personal Information, the devaluation of their mobile devices, and costs incurred as a result of Defendants' utilization of their valuable computer resources.

143.   Pursuant to section 17203 of the California Business and Professions Code, Plaintiffs, on their own behalf and on behalf of the Class, Plaintiffs seek restitution and a Court order enjoining Defendants from such future conduct and any other such orders that may be necessary to rectify the unlawful, unfair, and fraudulent business practices of Defendants. Each Defendant is jointly and severally liable for the conduct alleged hereunder of any other Defendants and/or Defendants.

**THIRD CLAIM FOR RELIEF**
**Violation of Right to Privacy**
**Article I, Section 1 of the California Constitution**
**Plaintiffs, on behalf of the Class, Against Defendants**

144.   Plaintiffs incorporate by reference all paragraphs previously alleged herein

145.   Plaintiffs have a legally protected privacy interest in their electronic communications and in the highly detailed and confidential Personal Information concerning Plaintiffs and Class Members that Defendants tracked and shared with third parties over a substantial period of time, without their knowledge or consent.

146.   Google's conduct, which by design, allowed third party Affiliates, like Defendants AdMob and AdWhirl, to obtain Plaintiffs and Class Members' Personal Information and to transmit such information without encryption, is not a standard, legitimate commercial

practice. Rather it is an egregious breach of industry standards, social norms, and is prohibited by law.

147.    As a direct and proximate result of Defendants wrongful conduct, Plaintiffs and Class Members have suffered harm as a result of their personal information and location history being acquired and disseminated without consent.

148.    Accordingly, Plaintiffs and Class Members seek declaratory and injunctive relief to prevent Defendants from continuing to track and expose their information.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Computer Crime Law**
**Cal. Penal Code § 502** *et seq.*
**Plaintiffs, on behalf of the Class, Against Defendants**

149.    Plaintiffs incorporate the foregoing by reference as if fully set forth herein.

150.    The California Computer Crime Law, California Penal Code § 502, referred to as the "CCCL" regulates "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."

151.    For purposes of this act, Plaintiffs and Class Members' mobile devices constitute a "computer system" and the information therein constitutes "computer data".

152.    Defendants violated California Penal Code section 502 by knowingly accessing, copying, using, making use of, interfering, and/or altering, data belonging to Plaintiffs and Class Members: (1) in and from the State of California; (2) in the home states of the Plaintiffs and Class Members; and (3) in the state in which the servers that provided the communication link between Plaintiffs and Class Members and the websites they interacted with were located.

153.    Defendants violated California Penal Code section 502(c)(1) by knowingly accessing and without permission altering and making use of data from Plaintiffs and Class Members' mobile devices (a) in order to devise and execute business practices to deceive Plaintiffs and Class Members into surrendering private electronic communications and activities for Defendants' financial gain, and to wrongfully control and/or obtain Plaintiffs and Class Members' valuable Personal Information.

154.    Defendants violated California Penal Code section 502(c)(2) by knowingly accessing and without permission taking, or making use of data from Plaintiffs and Class Members' mobile devices.

155.    Defendants violated California Penal Code section 502(c)(3) by knowingly and without permission using and causing to be used Plaintiffs and Class Members' mobile devices..

156.    Defendants violated California Penal Code section 502(c)(4) by knowingly accessing and, without permission, adding, altering, and/or damaging the data, computer software and/or computer programs which reside or exist internal or external to Plaintiffs and Class Members' mobile devices.

157.    Defendants violated California Penal Code section 502(c)(5) by knowingly and without permission disrupting or causing the disruption of Plaintiffs and Class Members' computer services or denying or causing the denial of computer services to Plaintiffs and the Class.

158.    Defendants violated California Penal Code section 502(c)(6) by knowingly and without permission providing, or assisting in providing, a means of accessing Plaintiffs and Class Members' computers, computer system, and/or computer network.

159.    Defendants violated California Penal Code section 502(c)(7) by knowingly and without permission accessing or causing to be accessed Plaintiffs and Class Members' computers, computer systems, and/or computer networks.

160.    Defendants violated California Penal Code section 502(c)(8) by knowingly introducing a computer contaminant, in the form of computer code for which neither Plaintiffs nor Class Members gave informed consent, into the Plaintiffs and Class Members' computers, computer systems, and/or computer networks, and doing so to obtain data regarding Plaintiffs and Class Members' electronic communications.

161.    As a direct and proximate result of Defendants wrongful conduct, Plaintiffs and Class Members have suffered harm and seek appropriate relief as provided for pursuant to California Penal Code § 502(e).

**FIFTH CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act**
**Penal Code § 630, *et seq.***
**Plaintiffs, on behalf of the Class, Against Defendants**

162.    Plaintiffs incorporate the foregoing by reference as if fully set forth herein.

163.    A violation of California Penal Code section 631(a) occurs when: Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument…or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above.

164.    At all relevant times, Defendants' business practices of accessing the mobile device data and Personal Information of Plaintiffs and Class Members was without authorization and consent and constitutes an electronic unauthorized connection.

165.    Defendants have read and learned the contents of Plaintiffs and Class Members phones and used the information gathered for advertising and data enrichment purposes.

166.    Plaintiffs and Class Members did not consent to Defendants' actions in intercepting, reading, and/or learning of the contents of their electronic communications.

167.    Plaintiffs and Class Members did not consent to any of the Defendants' actions in using the contents of their communications with such California-based entities.

168.    The electronic exchanges between Plaintiffs and Class Members on the one hand, and California-based Defendants, on the other, were confidential electronic communications being exchanged between the respective parties to those communications by means and across channels that did not disclose those communications to the public.

169.   Defendant caused and/or directly participated in the interception, reading, and/or learning the contents of the communications between Plaintiffs, Class Members and California-based entities.

170.   Defendants are not a "public utility engaged in the business of providing communications services and facilities" for which an exception applies.

171.   The actions alleged herein by the Defendants were not undertaken "for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility" for which an exception applies.

172.   The actions alleged herein by the Defendants were not undertaken in connection with "the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility" for which an exception applies.

173.   The actions alleged herein by the Defendants were not undertaken with respect to any telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility for which an exception applies.

174.   As a direct and proximate result of Defendants wrongful conduct, Plaintiffs and Class Members have been injured and seek appropriate relief.

**SIXTH CLAIM FOR RELIEF**
**Negligence**
**Plaintiffs, on behalf of the Class, Against Defendant Google**

175.   Plaintiffs incorporate the foregoing by reference as if fully set forth herein.

176.   Google owed a duty to Plaintiffs and Class Members to protect their Personal Information and data property, and take reasonable steps to protect them from the wrongful taking of such information and the wrongful invasion of their privacy.

177.   This duty is not based on any contractual obligation, but arises as a matter of law because at all times, Google knew or should have known of the likelihood of harm that would occur should it fail to act reasonably under the circumstances described above.

178.   Google also has a duty as the proprietor of its Android Market, to protect its consumers from, or at least warn of, harm from third parties that it reasonably foresees—

particularly where the harm is not evident to Plaintiffs and the Class. Such a duty arises out of the special relationship between Google and Plaintiffs.

179.   Google had an obligation to use reasonable care to prevent such harm or to adequately warn Plaintiffs and Class Members of such harm.

180.   Google breached its duty by:

a)   capturing and transmitting Plaintiffs and Class Members' unencrypted information, without their knowledge or consent;

b)   designing the Android operating system and the Android App Market to promote third party tracking, disclosures, and storage of users' UUIDs, personal characteristics, and personal information and activities in the course of using Apps;

c)   providing APIs (application programming interfaces) designed specifically so Apps can retrieve Personal Information stored on Plaintiffs and Class Members' mobile devices, without their knowledge or consent;

d)   continuing to upgrade its operating system to allow third parties to continue their unauthorized tracking and interception of electronic communication;

e)   failing to review and remove privacy-violating Apps from the Android Market;

f)   constructing and controlling consumers' user experience and mobile environment so that consumers, including Plaintiffs and Class Members, could not reasonably avoid such privacy-affecting actions; and

g)   Failing to adequately advise consumers about the privacy risk inherent in using the AOS. Specifically, the privacy policy and terms of use were unclear as to what information was being taken and how users could adequately opt out of having their information taken.

181.   As a direct and proximate result of Google's breaches of its duties, Plaintiffs and Class Members suffered the harms described more fully in the Section entitled "Harms Suffered" above, each of which were a reasonably foreseeable result of Google's negligence.

**SEVENTH CLAIM FOR RELIEF**
**Trespass to Chattels**
**Plaintiffs, on behalf of the Class, Against Defendants**

182.   Plaintiffs incorporate the foregoing by reference as if fully set forth herein.

183.   Common law prohibits the intentional intermeddling with personal property, including a mobile device, in possession of another that results in the deprivation of the use of the personal property or impairment of the condition, quality, or usefulness of the personal property.

184.   By engaging in the acts alleged in this Complaint without the authorization or consent of Plaintiffs and Class Members, Defendants intentionally intermeddled with Plaintiffs and Class Members' mobile devices.

185.   Defendants, without authorization, caused the installation of code that was embedded in Apps downloaded by Plaintiffs and Class Members to their mobile devices. This code was designed to operate surreptitiously and acquire Personal Information from such mobile devices, the acquisition of which Plaintiffs and Class Members did not reasonably expect or consent to.

186.   All the acts described above were acts in excess of any authority any user granted when he or she visited Google's Android Market and downloaded Apps with Defendants' tracking code.

187.   As a direct and proximate result of Defendants' wrongful conduct, Defendants harmed Plaintiffs and Class Members in the following ways:

  a)   By consuming the resources of and/or degrading the performance of Plaintiffs' and Class Members' mobile devices (including space, memory, processing cycles, Internet connectivity, and unauthorized use of their bandwidth);

b)    By diminishing the use of, value, speed, capacity, and/or capabilities of Plaintiffs' and Class Members' mobile devices;

c)    By devaluing, interfering with, and/or diminishing Plaintiffs' and Class Members' possessory interest in their mobile devices;

d)    By compromising the integrity, security, and ownership of Plaintiffs' and Class Members' mobile devices; and

e)    By depriving Plaintiffs and Class Members of the use of their personal property by taking their personal information without consent and distributing such information to third parties without providing Plaintiffs and Class Members financial compensation and thereby diminishing the value and demand for such information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendant as follows:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiffs as Class representatives, and appoint their counsel as Class counsel;

B.    Declare that the actions of Defendants, as set out above, violate the claims;

C.    Award injunctive and equitable relief including, *inter alia*: (i) prohibiting Defendants from engaging in the acts alleged above; (ii) require Defendants to disgorge all of their ill-gotten gains to Plaintiffs and the other Class Members, or to whomever the Court deems appropriate; (iii) require Defendants to delete all data surreptitiously or otherwise collected through the acts alleged above; (iv) require Defendants to provide Plaintiffs and the other Class Members a means to easily and permanently decline any participation in any data collection activities; (v) award Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendants by means of the wrongful conduct alleged herein; and (vi) order an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendants;

D.      Award damages, including statutory damages where applicable, to Plaintiffs and Class Members in an amount to be determined at trial;

E.      Award restitution against Defendants for all money to which Plaintiffs and the Class are entitled in equity;

F.      Restrain Defendants from continued access, collection, and transmission of Plaintiffs' and Class Members' personal information via preliminary and permanent injunction;

G.      Award Plaintiffs and the Class:

    a.      compensatory damages sustained by Plaintiffs and all others similarly situated as a result of Defendants' unlawful acts and conduct;

    b.      restitution, disgorgement and/or other equitable relief as the Court deems proper;

    c.      their reasonable litigation expenses and attorneys' fees;

    d.      pre- and post-judgment interest, to the extent allowable;

    e.      statutory damages, including punitive damages; and

    f.      permanent injunction prohibiting Defendants from engaging in the conduct and practices complained of herein.

H.      For such other and further relief as this Court may deem just and proper.

Dated January 23, 2012

AUDET & PARTNERS, LLP

/s/ William M. Audet
William M. Audet (CA State Bar #117456)
Mariana S. Cole (CA State Bar #269939)
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: (415) 568-2555
Facsimile: (415) 568-2556
Email:      waudet@audetlaw.com
Email:      mcole@audetlaw.com

Scott A. Kamber (*pro hac vice*)
David A. Stampley (*pro hac vice*)
100 Wall Street, 23rd Floor
New York, NY 10005-3704
Telephone: (212) 920-3072
Facsimile: (212) 290-3081
Email:      skamber@kamberlaw.com
Email:      dstampley@kamberlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Deborah Kravitz (SBN 275661)
KAMBERLAW, LLP
141 North St.
Healdsburg, California 95448
Telephone: (707) 820-4247
Facsimile: (212) 202-6364
Email:      dkravitz@kamberlaw.com

*Interim Class Co-Counsel*

Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN PLLP
Executive Committee Member
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone:      (612) 339-6900
Facsimile:      (612) 339-0981
Email:          rkshelquist@locklaw.com

Joseph H. Malley
LAW OFFICE OF JOSEPH H. MALLEY, PC
1045 North Zang Boulevard
Dallas, TX 75208
Telephone:      (214) 943-6100
Email:          malleylaw@gmail.com

Suzanne L. Havens Beckman
David Christopher Parisi
Azita Moradmand
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
Telephone: (818) 990 -1299
Facsimile (818) 501-7852
Email:  shavens@parisihavens.com
Email: dcparisi@parisihavens.com
Email: amoradmand@parisihavens.com

Salim Khawaja
LAW OFFICE OF SALIM KHAWAJA
1010 Second Avenue
Suite 1750
San Diego, CA 92101
Telephone:      (619) 685-5300
Facsimile:      (619) 685-5344
Email:          salimklaw@hotmail.com

Steven T. Budaj
Donald J. Andrews, II
Paul M. Hughes
STEVEN T. BUDAJ, P.C.
65 Cadillac Square
Suite 2915
Detroit, MI 48226
Telephone:      (313) 963-9330
Facsimile:      (313) 963-9185
Email:          stbudaj@counsel.cc
Email:          j.andrews2@excite.com
Email:          paul@attorneyhughes.com

Sara Dawn Avila
Gillian Leigh Wade
MILSTEIN ADELMAN, LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405
Telephone:      (310) 396-9600
Facsimile:      (310) 396-935
Email:          savila@milsteinadelman.com
Email:          gwade@milsteinadelman.com

Howard W. Rubinstein
Benjamin Lopatin
THE LAW OFFICES OF HOWARD W.
RUBINSTEIN
P.O. Box 4839
Aspen, CO 81612
Telephone:      (832) 715-2788
Facsimile:      (561) 688-0630
Email:          howardr@pdq.net
Email:          blopatin@gmail.com

Richard A. Proaps, Esq.
Cal. State Bar Number: 78898
8150 Greenback Lane
Building 200
Fair Oaks, Ca 95628
Tel:            (916) 722-1665
Fax:            (916) 722-4881
Email:  rproaps@aol.com

Aaron C. Mayer
MAYER LAW GROUP
18 Carolina Street
Suite B
Charleston, SC 29403
Telephone:      (843) 376-4929
Facsimile:      (888) 446-3963
Email:          aaron@mayerlawgroup.com

Nabil Majed Nachawati, II
FEARS NACHAWATI LAW FIRM
4925 Greenville Avenue
Suite 715
Dallas, TX 75206
Telephone:      (214) 890-0711
Facsimile:      (214) 890-0712
Email:          mn@fnlawfirm.com

Donald Amamgbo
AMAMGBO & ASSOCIATES
6167 Bristol Parkway, #325
Culver City, CA 90230
Telephone:      (310) 337-1137
Facsimile:      (310) 337-1157
Email:          donald@amamgbolaw.com

Reginald Terrell
THE TERRELL LAW GROUP
Post Office Box 13315, PMB #148
Oakland, CA 94661
Telephone:      (510) 237-9700
Facsimile:      (510) 237-4616
Email:          reggiet2@aol.com

E. Kirk Wood
WOOD LAW FIRM, LLC
P.O. Box 382434
Birmingham, AL 35238-2434
Telephone:      (205) 612-0243
Facsimile:      (866) 747-3905
Email:          ekirkwood1@bellsouth.net

Joe R. Whatley, Jr.
Whatley, Drake, & Kallas
2001 Park Place North
Suite 1000
Birmingham, AL 35203
Telephone:      (205) 328-9576
Facsimile:      (205) 328-9669
Email:          jwhatley@wdklaw.com

Jeremy Reade Wilson
WILSON TROSCLAIR & LOVINS
302 North Market Street
Suite 501
Dallas, TX 75202
Telephone:      (214) 430-1930
Facsimile:      (214) 276-1475
Email:          jeremy@wtlfirm.com

Brian W. Smith
SMITH & VANTURE, LLP
1615 Forum Place, Suite 4C
West Palm Beach, FL 33401
Telephone:      (561) 684-6330
Facsimile:      (561) 688-0630
Email:          bws@smithvanture.com

Attorneys for Plaintiffs

First Amended Consolidated Class Action Complaint

1

## JURY TRIAL DEMAND

2

Plaintiff hereby demands a trial by jury of all issues so triable.

3

4

Dated January 23, 2012          AUDET & PARTNERS, LLP

5

6

          _/s/ William M. Audet_____

          William M. Audet (CA State Bar #117456)

7

          Mariana S. Cole (CA State Bar #269939)

8

          AUDET & PARTNERS, LLP

          221 Main Street, Suite 1460

9

          San Francisco, CA 94105

          Telephone: (415) 568-2555

10

          Facsimile: (415) 568-2556

          Email:     WAudet@audetlaw.com

11

          Email:     mcole@audetlaw.com

12

13

          Scott A. Kamber (_pro hac vice_)

          David A. Stampley (_pro hac vice_)

14

          100 Wall Street, 23rd Floor

          New York, NY 10005-3704

15

          Telephone: (212) 920-3072

          Facsimile: (212) 290-3081

16

          Email:     skamber@kamberlaw.com

          Email:     dstampley@kamberlaw.com

17

18

          DEBORAH KRAVITZ (SBN 275661)

          dkravitz@kamberlaw.com

19

          KAMBERLAW, LLP

          141 North St.

20

          Healdsburg, California 95448

          Telephone: (707) 820-4247

21

          Facsimile: (212) 202-6364

22

          _Interim Class Co-Counsel_

23

24

25

26

27

28

First Amended Consolidated Class Action Complaint

## <u>CERTIFICATE OF SERVICE</u>

I, Mariana Cole, an attorney, hereby certify that on January 23, 2012, I caused the above *First Amended Consolidated Class Action Complaint*, to be served by causing true and accurate copies of such documents to be electronically filed and transmitted to counsel of record through the Court's CM/ECF electronic filing system.


Date:   January 23, 2012                    Respectfully submitted,

                                            /s/ Mariana S. Cole
                                            AUDET & PARTNERS, LLP
                                            221 Main Street, Suite 1460
                                            San Francisco, CA 94105
                                            Telephone: (415) 568-2555
                                            Facsimile: (415) 568-2556
                                            Email: WAudet@audetlaw.com
                                            Email: mcole@audetlaw.com