William M. Audet (CA State Bar #117456)
waudet@audetlaw.com
Jonas P. Mann (CA State Bar #263314)
jmann@audetlaw.com
Audet & Partners, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: (415) 568-2555
Facsimile:  (415) 568-2556

Interim Class Counsel

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: GOOGLE ANDROID CONSUMER PRIVACY LITIGATION<br><br>This Document Relates to:<br>ALL CASES | No. M 11-02264 JSW<br>MDL No. 2264<br><br>Member Cases:<br>No. C 11-02157-JSW<br>No. C 11-02167-JSW<br>No. C 11-02230-JSW<br>No. C 11-02427-JSW<br>No. C 11-03688-JSW<br>No. C 11-04241-JSW<br>No. C 11-04429-JSW<br>No. C 11-04506-JSW<br>No. C 11-04573-JSW<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>1. COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C § 1030; and<br><br>2. UNFAIR COMPETITION LAW, CAL. BUS. AND PROF. CODE § 17200. |

1       In this Second Amended Consolidated Class Action Complaint ("SAC"), the persons

2   designated below as Plaintiffs ("Plaintiffs"), each on his or her own behalf and, collectively, on

3   behalf of all others similarly situated (the putative "Class"), make the following allegations

4   against Google, Inc. ("Google") based on each Plaintiff's personal knowledge of their own acts

5   and observations and, otherwise, upon information and belief based on investigation of counsel.

6   To the extent the Complaint refers to actions directed at Plaintiffs, such allegations also refer to

7   actions directed at all Members of the Class Plaintiffs seek to represent.

8                                    **I. NATURE OF CASE**

9       1.      Plaintiffs and similarly situated Class Members were victims of privacy

10  violations and unfair business practices engaged in by Defendant that harmed their privacy,

11  security, and financial interests.

12      2.      Defendant gained and allowed third parties to have unauthorized access to, and

13  engaged in unauthorized use of, Plaintiffs' and Class Members' mobile devices on which

14  Google's Android Operating System ("AOS") is installed.  The AOS is Google-provided

15  computer code common to the operation of all Android mobile telephones ("Android Mobile

16  Phones") and other Android mobile devices.

17      3.      Google designed the AOS for mobile phones with one or more features

18  engineered specifically to enable and promote the taking of Plaintiffs' and Class Members'

19  personal information so as to further monetize, for Defendant's benefit, the advertising potential

20  of AOS-based devices and to advance Google's revenue model in the wireless/mobile

21  marketplace. Google plays a dual role in the operation of the Android ecosystem that it created:

22  Google acts as both the operator and designer of the AOS, as well as providing an advertising

23  placement service for the Apps that it hosts on Google Play (formerly known as the Android

24  Market).

25      4.      During the Class Period, each of the Plaintiffs installed certain application

26  software ("Apps") on their mobile phones.  Without full notice certain Apps collected personal

27  data from their Android Mobile Phones and shared this data with Defendant. The personal data

28  that was collected was transmitted to third parties with whom Plaintiff had no relationship, or

even awareness of their existence, for purposes wholly unrelated to the use and functionality of their Android Mobile Phones or the Apps in which the data collection code was hidden.  This sharing was made possible by the AOS and computer code provided for the Apps by Defendant. This collection and sharing was done with the knowledge, consent and participation of Defendant—but not with the full notice to or consent of Plaintiffs.

5. Certain data, such as geolocation information, was collected by the AOS itself and sent to Google and/or third parties regardless of whether Plaintiffs installed any Apps.

6. In addition to Defendant's collection of Plaintiffs' and Class Members' personal data, Google also failed to fully advise Plaintiffs and Class Members that by using their Android Phones or by downloading Apps, their data would be subjected to collection and tracking by other third parties, and failed to provide Plaintiffs and Class Members with an appropriate mechanism to prevent the improper collection and sharing of their data by Defendant and third parties.

7. None of the Plaintiffs were made fully aware of or otherwise knowingly consented to the collection of their data.

8. The information collected included, but was not limited to: Class Members' home and workplace locations and current whereabouts; several universally unique device identifiers ("UUIDs") assigned to Plaintiffs' Android mobile phones; other device-specific data that was useful to Google and third parties for purposes of "device fingerprinting;" (i.e., the creation of a back-up unique identifier to engage in tracking of a particular device); along with personal information about Plaintiffs such as their gender and age, what functions Plaintiffs performed on Apps, search terms entered, and selections of movies, songs, or restaurants.

9. The effect of this surreptitious use of resources had a real cost to Plaintiffs and other Class Members through the consumption and use of battery life, bandwidth, and file storage of their Android Mobile Phones.

10. The tracking of Plaintiffs' and other Class Members' personal information and phone usage benefitted Defendant financially because it was able to monetize the data in the sale of advertising over Google's networks.

11. The collection and use of Plaintiffs' and other Class Members' personal information and data about their phone usage harmed Plaintiffs and other Class Members by reducing its value. Defendant obtained it without full notice or the knowing consent of Plaintiffs and other Class Members, and did not fully and appropriately compensate Plaintiffs and other Class Members for it.

12. The collection and sharing of Plaintiffs' and other Class Members' personal information and phone usage harmed Plaintiffs and other Class Members because when Defendant caused the collection and transmission of that data, they impermissibly consumed a portion of Plaintiffs' data plans that were then unavailable for them to use without incurring additional expense.

13. The collection and sharing of Plaintiffs' and other Class Members' personal information and phone usage harmed Plaintiffs and other Class Members because they paid more for their Android phones than they otherwise would have if they had known the phones would be tracking and sharing their personal data.

14. The collection and sharing of Plaintiffs' and other Class Members' personal information and phone usage harmed Plaintiffs and other Class Members because when Defendant caused the collection and transmission of that data, Defendant impermissibly utilized and consumed Plaintiffs and other Class Members' phones' battery power which shortens the battery life of their phone batteries and thus caused or will cause them to incur future expenses in order to buy replacement batteries or phones.

15. On April 22, 2011, The Wall Street Journal reported on Google's tracking of personal information and stated that Android "collected its location every few seconds and transmitted the data to Google at least several times an hour." ("Apple, Google Collect User Data," Wall Street Journal, April 22, 2011).

http://online.wsj.com/article/SB10001424052748703983704576277101723453610.html).

16. In 2012, an eighteen month study conducted by Juniper Networks concluded that 24% of free apps tracked location data. The study further found that Apps routinely requested access to a user's phone and personal information beyond what is needed for the operation of

the App. For example, Apps requested permission to send texts messages, access contact lists, take pictures, and make phone calls often with absolutely no relation to the purpose of the App. ("Free Android apps cost users security, privacy," TechNewsDaily). http://www.nbcnews.com/technology/technolog/free-android-apps-cost-users-security-privacy-1C6848002

17.     In February 2013, it was revealed that Google sent personally identifying information of users, including contact information, to app developers after a user has purchased the developer's app. ("Google privacy issues in forefront again," CBS MoneyWatch, February 18, 2013). http://www.cbsnews.com/8301-505124_162-57569867/google-privacy-issues-in-forefront-again/

18.     On February 15, 2013, The Daily Mail reported on Google's continued sharing of users' personal information and revealed that Google was providing app developers with users' names, email addresses, and home addresses. ("Privacy outrage after it emerges Google is sharing Android users' names, emails and ADDRESSES with app developers," Mail Online, February 15, 2013. http://www.dailymail.co.uk/sciencetech/article-2279232/Privacy-outrage-emerges-Google-sharing-Android-users-names-emails-ADDRESSES-app-developers.html

19.     Google has taken affirmative steps to decrease users' ability to limit the amount of personal and location data that is shared. In March 2013, Google removed from Google Play AdBlock Plus, an app that limited access to private data of Android users. Previously available on Google Play, AdBlock Plus allowed users to block ads and prevent third party tracking of their phones. ("Google's Latest Privacy Attack," Salon, March 15, 2013. http://www.salon.com/2013/03/15/googles_latest_privacy_attack/

20.     In 2011, Google reached a consent order with the United States Federal Trade Commission in order to settle claims related to prior privacy violations. The consent order provides, *inter alia*, that Google "shall not misrepresent in any manner, expressly or by implication… the extent to which respondent maintains and protects the privacy and

confidentiality of any covered information, including, but not limited to, misrepresentations related to: (1) the purposes for which it collects and uses covered information, and (2) the extent to which consumers may exercise control over the collection, use, or disclosure of covered information." (*See* http://www.ftc.gov/os/caselist/1023136/110330googlebuzzagreeorder.pdf).

21.    Google's conduct in continuing to misrepresent how Android tracks a user's location and personal information is in violation of that consent order.

## II. JURISDICTION AND VENUE

22.    This Court has subject-matter jurisdiction over this action pursuant to: (a) Title 28, United States Code, Section 1331; and (b) The Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. Sections 1332(a) and (d), because the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, and more than two thirds of the members of the Class are citizens of states different from those of Defendant.

23.    Under CAFA, the federal courts have exclusive jurisdiction over all class actions with an amount in controversy in excess of $5,000,000. Here, the statutory claims alone have a value far in excess of that amount, which establishes jurisdiction.

24.    Venue is proper in this District under Title 28, United States Code, Sections 1391(b) and (c) because Defendant's improper conduct alleged in this Complaint occurred in, was directed from, and/or emanated from this judicial district. Defendant Google has its principal places of business in this district.

## III.    STANDING

25.    Each of the Plaintiffs has standing to bring this case under Article III of the United States Constitution.

26.    Plaintiffs have standing by virtue of alleging concrete, tangible and non-speculative injuries in fact, arising from violations of federal and state statutes and/or the violation of constitutional rights.   The harms they allege, including the invasion of both statutory and constitutional rights, are traceable to Defendant's actions. Further, the relief they seek encompasses both monetary and injunctive remedies due to actual harm and injury to Plaintiffs.

27.   Plaintiffs have each suffered harm and economic injury as a direct result of each Defendant's actions and practices of collecting, compiling and distributing Plaintiffs' personally identifiable information, including geolocation data and UUID's.

28.   The data collected from Plaintiffs and Class Members is property and has an independent, quantifiable market value to both Plaintiffs and Defendant.

29.   As with any form of property, the owners – Plaintiffs and Class Members – suffered a concrete, measurable damage and injury the exact amount of which shall be provided by Plaintiffs through expert opinion.

30.   Additionally, the scope of the collection and transmission of geolocation data back to Google, and the concomitant drain on Android Device resources, such as battery life, was not fully disclosed to Plaintiffs and other Class Members. Specifically, Google claimed that users may "opt-in" to having their location tracked but misrepresented that in doing so Plaintiffs and other Class Members' information will be "anonymized." This, however, is not the case because even when geolocation services are turned off, Android Devices continued to store geolocation data on the Android Devices, which were transmitted to Google the next time geolocation services are turned on.  Further, Plaintiffs and Class Members were not truly "anonymized" because the location data that is sent back to Google is directly tied to a users' UUID, which is personally identifiable information.

31.   Geolocation data was collected multiple times per minute and the information collected was transmitted back to Google several times an hour.  Google also used the system resources of Plaintiffs and Class Members to transmit detailed information back to itself about nearby Wi-Fi networks.

32.   Defendant's culpability for unreasonable and unexpected battery consumption and diminution of battery life can be discerned through mobile network carriers' diagnostic data collection, most of which was done through Carrier IQ software.

33.   Carrier IQ provides software that mobile network service providers embed or pre-load on the mobile phones they sell. The software is designed to provide service diagnostic data to the carriers. Carrier IQ diagnostic details include measurement of battery charge level,

drain, and charge cycles and contemporaneous documentation of specific application events and functions.

34.    Such measureable loss without adequate compensation is sufficient to satisfy Article III standing for injury.

## IV. PARTIES

**A.    Named Plaintiffs**

35.    Plaintiff KENDRICK COCHRAN is an adult individual who is a citizen and a resident of Vallejo, California. At all relevant times herein, Plaintiff Cochran owned and used an Android mobile device, and used Apps he downloaded from the Android Market, including Advanced Task Killer and Pandora.

36.    On or around May 2012, Plaintiff Cochran purchased a Galaxy Nexus Android phone for $200.00.  He previously owned and used a Motorola Droid X.

37.    Plaintiff NICHOLAS LAWRENCE is an adult individual who is a citizen and a resident of Cedar Park, Texas. At all relevant times herein, Plaintiff Lawrence owned and used an Android mobile device, and used Apps he downloaded from the Android Market, including Angry Birds.

38.    In or around November 2011, Plaintiff LAWRENCE purchased an HTC EVO 4G for $399.00.

39.    Plaintiff BEVERLY JULIA LEVINE HILLMAN-SEIDNER is an adult individual who is a citizen and a resident of Dallas, Texas. At all relevant times herein, Plaintiff Hillman-Seidner owned and used an Android mobile device, and used Apps she downloaded from the Android Market, including Pandora.

40.    In or around February 2010, Plaintiff Hillman-Seidner purchased LG Android device for $599.

41.    Plaintiff JOAN SMITH is an adult individual who is a citizen and a resident of Birmingham, Alabama. At all relevant times herein, Plaintiff Smith owned and used an Android mobile device, and used Apps she downloaded from the Android Market, including Pandora.

42.    In or around November 2010, Plaintiff SMITH purchased a Motorola Droid 2 for

$199.00.

43.     Plaintiff PHILLIP HALL is an adult individual who is a citizen and a resident of Addison, Texas. At all relevant times herein, Plaintiff Hall owned and used an Android mobile device, and used Apps he downloaded from the Android Market, including Advanced Task Killer and Pandora.

44.     In or around August 2010, Plaintiff Hall purchased an EVO 4g Android phone for $299.00.

45.     Plaintiff MARITSA URIAS is an adult individual who is a citizen and a resident of Dallas, Texas. At all relevant times herein, Plaintiff Urias owned and used an Android mobile device, and used Apps she downloaded from the Android Market, including Pandora.

46.     Plaintiff URIAS purchased an Optimus T for approximately $100.00 in or around October 2010.

**B.     Defendant**

47.     Defendant, GOOGLE, INC. is a company organized and existing under the laws of the State of Delaware, with its principal place of business located in Mountain View, California.

48.     Google provides the AOS for many popular mobile computing devices. Google also provides advertising services to App developers running Apps on mobile devices using Google's AOS.

49.     Google conducts substantial business throughout the entire United States by advertising and through the extensive use of distribution channels that deliver and sell goods and services to consumers. In 2010, 96% of Google's $29 billion in revenue was generated through advertising.  Google is the owner of AdMob Inc. and its subsidiary AdWhirl, mobile advertising networks. Google also operates ad network DOUBLECLICK, and provides analytics services through GOOGLE ANALYTICS.

# V. ALLEGATIONS OF FACT

**A.      Background**

50.     Google designed Android, a computer operating system for mobile devices, as an "open" system that could easily be used and adapted by manufacturers of mobile phones and developers of Apps for mobile phones.

51.     On October 22, 2008, Google launched the Android Market, now known as Google Play, which is an online software store developed by Google for Android devices. An App previously called "Market" and now called "Play"[1] is preinstalled on most Android devices and allows users to browse and download other Apps developed by third-party developers, hosted on Google Play. Users can also search for and read detailed information about Apps from the Google Play website.

52.     Apps available in the Android Market relate to all aspects of consumers' personal and business lives, with categories consisting of: Books & Reference, Business, Comics, Communication, Education, Entertainment, Finance, Health & Fitness, Libraries & Demo, Lifestyle, Live Wallpaper, Media & Video, Medical, Music & Audio, News & Magazines, Personalization, Photography, Productivity, Shopping, Social, Sports, Tools, Transportation, Travel & Local, Weather, game-specific categories of Arcade & Action, Brain & Puzzle, Cards & Casino, Live Wallpaper, Racing, Sports Games, and Widgets.

53.     Numerous Apps available from the Android Market are created by developers known as "Google Application Developers". Google Application Developers are application developers who entered into an "Android Market Developer Distribution Agreement," with Defendant Google.  There are several hundred thousand Apps available in Google Play, some of which are free and some of which are sold for a fee, by Google Application Developers.

54.     Google created the technology environment to enable Defendant to access substantial information about Plaintiffs. First, Google created the AOS, which not only "runs"

---

[1] Previously known as the Android Market, Google renamed the service Google Play. As used in the SAC the two terms are interchangeable.

the device, but also performed the functions that routinely sent Plaintiffs' and other Class Members' current geolocation coordinates to Google itself. Second, Google designed the AOS to include software "hooks" which allow specific information about an Android Mobile Phone, and what a user is doing with the phone, to be available to an App running on the phone. Third, so that an App developer can take advantage of these hooks, Google provides App developers a software development kit ("SDK") that included the code (application programming interfaces, or "APIs") needed in an App to take advantage of the operating system hooks.

55.     An SDK is typically a set of development tools which allow for the creation of applications for a certain software package, software framework, hardware platform, computer system, video game console, operating system, or similar platform. It may be something as simple as an application-programming interface (API) in the form of files interfacing with a particular programming language or include sophisticated hardware to communicate with a certain embedded system. SDKs are provided to Application Developers free of charge to encourage them to use the code provided by third party affiliates such as AdMob and AdWhirl.

56.     Defendant provided App Developers with specific API code to be embedded in Plaintiffs' Apps in order to accomplish the data collection sought by Defendant.  The purpose of the code Defendant embedded in the Apps included collection of Plaintiffs' information to identify and track Plaintiffs and other Class Members' activity and location data for use in building behavioral profiles of Plaintiffs and other Class Members for purposes of ad-targeting, and to compile analytics data regarding Plaintiffs' uses of Apps.

57.     An App developed using Google's SDK will only function on Android Devices and can only interact with the AOS and features in the ways permitted by Google.

58.     Google controled the process for the development of software as well as influencing developers to use Google's SDK, and provided highly detailed guidelines for App development.

59.     Google does not pre-approve the Apps before they are added to Google Play, however no developer is permitted to sell an App in the Android Market without entering into Google's form AOS Developer Agreement.

60.     Although Google considers its Android Market to be an Open Distribution Channel for App developers, Google removes approximately one percent of all Apps from its Market for violations of terms of the AOS Developer Agreement.   Further, after a user downloads an App, Google maintains control by requiring that the end-user license agreement for every third-party App include a clause giving Google the ability to step into the shoes of the App developer to control the user's use of the App.

61.     Although Google requires Android Apps to notify users of some of the data sources the App intends to access on their devices before an App is downloaded, Google does not require Apps to ask permission to access some forms of the device ID, or to send it to outsiders.

62.     Google is lax in the oversight and policing of the Android Market and only rarely takes steps to remove Apps both from its Market and from users' devices after they have been posted on the Android Market.

63.     On Android mobile phones, the Android operating system stores unique information identifying each individual device, including a UUID. Each UUID is stored in and linked to the particular Android Mobile Phone and cannot be changed or erased. Each UUID is unique. Thus, because of its persistence and uniqueness, when it is collected it makes all data collected about Plaintiffs and Class Members from the Android Mobile Phone personally identifiable information.

64.     The information taken included numerous forms of unique identifiers, precise data pinpointing Plaintiffs' geographic locations, App activity such as searches and music/video selections, as well as information regarding age and gender.

65.     This information (unique identifiers, precise geographic location, and records of App activity, age and gender), was not needed for the functioning of the Apps at issue, or to display advertising.

66.     Plaintiffs and Class Members did not provide informed fully consent to third parties collecting their personal and personally identifiable information.

67.     Since the information was transmitted unencrypted to Defendant,   these

unsecured transmissions were particularly inappropriate given the likelihood that many users of Apps are minors. Such unencrypted transmission also violated the standards recommended by the U.S. Department of Commerce' Guidelines on Cell Phone and PDA Security.

68.     Since there was never full or accurate disclosure by the Defendant, Plaintiffs and Class Members did not expect or fully consent to Defendant's collection and sharing of their data when they purchased their Android mobile phones.

**B.     Personal Information**

69.     "Personal Information" is information about a particular person and includes "Personally Identifiable Information" (or "PII"), which includes geolocation data as well as the following categories of data identified by the Federal Trade Commission:

> Individually identifiable information from or about an individual [consumer] including, but not limited to: (a) a first and last name; (b) a home or other physical address, including street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name that reveals an individual's email address; (d) a telephone number; (e) a Social Security Number; (f) a persistent identifier, such as a customer number held in a "cookie" or processor serial number, that is combined with other available data that identifies an individual; or (g) any information that is combined with any of (a) through (f) above.

### Geolocation Information

70.     Google routinely acquired information about the precise geographic locations of Android Mobile Phone users, including Plaintiffs and other Class Members. This geolocation information is highly detailed, pinpointing Plaintiffs and other Class Members' locations with an accuracy of a matter of a few feet. The AOS collects data about locations of users regardless of whether a particular App is running.

71.     Specifically, there are two files in an Android phone that are responsible for storing location data of users—"cache.cell," which holds a list of the last 50 cell phone towers a users' handset has communicated with, and "cache.wifi." These files are limited in the amount of location data they store and are rewritten when each folder reaches its maximum capacity.

72.     Regardless of when the list of locations is rewritten, the Android device tracked users' locations and in doing so, compiles information that creates a thorough record of where

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

users live, work, attend school, seek entertainment, or worship based on frequencies and types of locations recorded at particular times of day.

73. Google purportedly allowed users to "opt-in" to having their geolocation tracked and purports that once a user "opts-in", they are "anonymized". This, however, is not the case for the following reasons:

a) Even when geolocation services are turned off, Android Devices continue to store geolocation data on the Android Devices, which are transmitted to Google the next time geolocation services are turned on; and

b) Google falsely claims that once users opt-in, they will be "anonymized" – this claim is false because any location data that is sent back to Google location servers is tied and/or traceable to a specific user through the use of UUIDs.

### Data Collected From Apps

74. As noted by the online advertising industry organization, the Network Advertising Initiative (NAI):

> While advertising networks do collect data on consumers who view their advertising, this data is often anonymous. However, profiles derived from tracking consumers' activities on the Web can be linked or merged with "personally identifiable information" (PII). It can also be combined with offline purchase data or information collected via a survey, census, or registration form.

*FAQs*, NAI, available at http://www.networkadvertising.org/managing.

75. It is contrary to industry standards to "de-anonymize" a consumer's profile data by inferring identity from multiple data points or linking anonymous data with personally identifiable information, unless the party doing so has obtained the consumer's explicit consent.

76. The information collected by Defendant through the code embedded in Plaintiffs' Apps includes personally identifiable information as well as information about Plaintiffs' mobile phone device settings and characteristics which, taken together, are increasingly used by tracking companies for "device fingerprinting," that is, constructing a universally unique identifier by combining several elements that remain constant and which, when combined, are unique.

77. The specific information Defendant collected through its code embedded in particular Apps is detailed further below and includes the following types of information:

a) *Information about or identifying user:* UUID, precise geolocation, age, gender, zip code and country of residence; in addition, a number of Apps assign their own unique identifiers to individual Plaintiffs and share these unique identifiers with advertisers;

b) *Information about user App activity*: name, identifier, or web address of App; user's search term (*e.g.*, restaurant, food type, store) or selection (*e.g.*, song, artist, book, author) and the web page address on the App's server with which the user is interacting;

c) *Device characteristics:* AOS version/build ID, language setting in browser; device make/model; and screen color depth and/or resolution; and

d) *Tracking Management:* pixel tag ID (*i.e.*, Defendant's ID assigned to an invisible tracking code embedded in a web page associated with an App) and other identifier codes used by Defendant or an App to retrieve analytics data from a Google Analytics account. As set forth below, Defendant (directly or through entities it owns or controls), captured data, including the following specific examples, through the use of specific API code they embedded in the Apps which follow:

***Google Analytics***

78. Through the FourSquare App, Google Analytics collected the following information: user geographic position (lat./lon.), URL/title for current page, language, screen color depth and/or resolution, language (browser), pixel tag ID, tracker's Google Analytics account ID, and tracking code version.

79. Plaintiff LAWRENCE installed and used the FourSquare App.

80. Through the Groupon App, Google Analytics collected the following information: unique user ID assigned by Groupon and stored in cookie, URL/title for current page, information custom-defined by tracker, language, screen color depth and/or resolution, language (browser), type of event being tracked (e.g.; event, transaction, items), pixel tag ID, tracker's Google Analytics account ID, and tracking code version.

81. Plaintiff LAWRENCE installed and used the Groupon App.

*DoubleClick; AdMob; and AdWhirl*

82.    Through the Advanced Task Killer App, DoubleClick collected the following information: identity of App (name, ID, web address), network, and user's audio settings.

83.    Plaintiffs HALL and COCHRAN installed and used the Advanced Task Killer App.

84.    Through the Angry Birds App, DoubleClick collected the following information: identity of App (name, ID, web address).

85.    Plaintiff LAWRENCE installed and used the Angry Birds App.

86.    Through the Pandora App, DoubleClick collected the following information: user age, user gender, user zip code, media artist selected by user, phone make and/or model, and Android version/build ID.

87.    Plaintiffs SMITH, HILLMAN-SEIDNER, and URIAS, installed and used the Pandora App.

**C.    Harms Suffered**

<u>**Collection And Sharing of Valuable Personal Information**</u>
<u>**Without Appropriate Notice or Consent**</u>

88.    Plaintiffs did not receive full or accurate notice of the collection of personal information data, including geolocation information.

89.    Although Google recommended that users install only Apps they trust and provides assurances to users that their privacy and security are protected because suspicious Apps can be uninstalled at any time, Google failed to address how users can make informed decisions about which Apps are trustworthy and which are not.

90.    Additionally, although Google offered an "opt-in" approach to having user's geo-locations tracked, Google misrepresents that users will be "anonymized" and does not alert users to the fact that the geolocation tracking, is in fact, linked back to each users UUID.

91.    The data collected from Plaintiffs and Class Members is property and has an independent, quantifiable market value to both Plaintiffs and Defendant.

92.    Plaintiffs and other Class Members have each suffered harm and economic injury

as a result of Defendant's actions of surreptitiously compiling and disseminating personal information and geolocation information.

93.     The collected personal information is quantifiable and thus is of actual value to Plaintiffs.

94.     As a result of Plaintiffs' and Class Members' data being disseminated, the value and demand for such data by marketing and research companies that would have paid a certain amount for the data has now been diminished and Plaintiffs and Class Members have lost the opportunity to sell such data for full market value.

95.     Personal information clearly has economic value based on the fact that such information is often sold for marketing and research purposes.

96.     Plaintiffs and Class Members have suffered economic loss as a result of Defendant's surreptitious acquisition, compilation, and dissemination of their personal information, including geolocation history, due to the fact that Plaintiffs and Class Members were not provided financial compensation for the value of their personal information. Additionally, the value and demand for such information for marketing and research purposes is now diminished as a result of Defendant's dissemination of the information and Plaintiffs and Class Members have lost the opportunity to profit from such information at full market value.

97.     Plaintiffs paid more for their phones than they otherwise would have had they known the true nature of the phones' involuntary sharing of their personal information.

**Improper Resource Utilization**

***Battery Utilization***

98.     The acquisition of location data on Android devices is accomplished with GPS satellite position data. The acquisition of this data is resource intensive and consumes battery life on Android mobile phones; in fact, a recommended method for resource conservation is to minimize GPS use.

99.     The rate at which battery charge was diminished on the Android mobile phones as a result of Defendant's actions was material to Plaintiffs and other Class Members, particularly given the power resource constraints on the Android mobile phone.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

100.    Not only did Defendant's actions cause Plaintiffs and other Class Members' Android Mobile Phone batteries to discharge more quickly, rendering the Android Mobile Phones less useful given their unexpected power consumption, but they interrupted Plaintiffs' and Class Members' services.

101.    Further, because Defendant's actions caused the batteries of Plaintiffs' mobile phones to discharge more quickly, Defendant reduced the utility of those mobile phone batteries because each charge and discharge cycle causes chemical changes in the active battery material, diminishing the battery's storage capacity, requiring ever more frequent recharging.

102.    The improper resource utilization shortened the life of the batteries, which will necessitate their earlier replacement. Plaintiffs and other Class Members will be forced to bear the cost of the replacement batteries. The cost of replacing batteries can run as high as $70.00 or more.

### *Data Plan Utilization*

103.    By collecting and transmitting data, Defendant used or allowed the use of a finite amount of Plaintiffs' and Class Members' data plans. Mobile phone users, including Plaintiffs and Class Members, pay for a set amount of data each month. For example, AT&T's current data plans are 300MB/month for $20; 3GB/month for $30; and 5GB/month for $50. Once that data amount is reached users must pay overage charges. For example on most AT&T and Verizon plans it is $15 per 1 gigabyte of data over the plan amount.

104.    Any amount of data used has value given that Plaintiffs and Class Members pay for their data plans.

105.    Thus Defendant's conduct has damaged Plaintiffs and Members of the Class first by using a portion of the available data in their data plans and second by potentially exposing them to data overage charges.

**D.    Misrepresentations By Google**

106.    In order to use any Android device, the user, including all Plaintiffs and Class Members, must first accept Google's Terms of Service.

107.   Google's Terms of Service state that a user agrees to the Terms of Service by "(A) clicking to accept or agree to the Terms, where this option is made available to you by Google in the user interface for any service; or (B) by actually using the Services. In this case, you understand and agree that Google with treat your use of the Services as acceptance of the Terms from that point onwards."

108.   Google's Terms of Service incorporate the actions of its subsidiaries, including AdMob, AdWhirl, DoubleClick, and Google Analytics. Google's Terms of Service state "Google has subsidiaries and affiliated legal entities around the world ("Subsidiaries and Affiliates"). Sometimes, these companies will be providing the Services to you on behalf of Google itself. You acknowledge and agree that Subsidiaries and Affiliates will be entitled to provide the Services to you."

109.   Google's Terms of Service incorporate its privacy policy, and state: "For information about Google's data protection practices, please read Google's privacy policy at http://www.google.com/privacy.html. This policy explains how Google treats your personal information, and protects your privacy, when you use the Services[]" and "You agree to the use of your data in accordance with Google's privacy policies."

110.   Google's October 2011 privacy policy makes the following representations concerning the use of user data:

a)   "If we use this information in a manner different than the purpose for which it was collected then we will ask for your consent prior to such use."

b)   "Google only shares personal information with other companies or individuals outside of Google in the following limited circumstances:

- We have your consent. We require opt-in consent for the sharing of any sensitive personal information.

- We provide such information to our subsidiaries, affiliated companies or other trusted businesses or persons for the purpose of processing personal information on our behalf. We

require that these parties agree to process such information based on our instructions and in compliance with this Privacy Policy and any other appropriate confidentiality and security measures.

- We have a good faith belief that access, use, preservation or disclosure of such information is reasonably necessary to (a) satisfy any applicable law, regulation, legal process or enforceable governmental request, (b) enforce applicable Terms of Service, including investigation of potential violations thereof, (c) detect, prevent, or otherwise address fraud, security or technical issues, or (d) protect against harm to the rights, property or safety of Google, its users or the public as required or permitted by law."

c)   "We take appropriate security measures to protect against unauthorized access to or unauthorized alteration, disclosure or destruction of data."

d)   "We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it on our behalf. These individuals are bound by confidentiality obligations and may be subject to discipline, including termination and criminal prosecution, if they fail to meet these obligations."

e)   "Google regularly reviews its compliance with this Privacy Policy."

111.   The privacy policies dated October 3, 2010; March 11, 2009; January 27, 2009; August 7, 2008 contain nearly identical language.

112.   Plaintiffs and other Class Members relied on the statements in Google's Terms of Service and Privacy Policies that their personal information would be kept secure.

113.   Based on the representations in Google's Terms of Service and Privacy Policies, Plaintiffs and other Class Members did not expect that their personal information, including their phone use habits and their location, would be collected and shared.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

114. Defendant failed to abide by its own Terms of Service and Privacy Policies and allowed Plaintiffs' and other Class Members' personal information to be accessed for inappropriate purposes <u>and</u> by third parties.

115. Because Google required users to consent to the Terms of Service before using an Android Device or accessing Google Play, the above representations were made to each and every Plaintiff and putative Class Member when they first activated their phones and signed up for an account in the Android Market.

## VI. CLASS ALLEGATIONS

116. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), Plaintiffs bring this action as a class action, on behalf of themselves and all others similarly situated as members of the following proposed class (the "Class"):

> All individuals residing in the United States who used mobile devices that operate with an Android operating system and from whom information about them and/or their mobile device was acquired without their knowing consent.

117. By failing to enforce its Terms of Service and Privacy Policy and allowing third parties to access Plaintiffs' and Class Members' personal information, Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate for the class as a whole.

118. On behalf of the Class, Plaintiffs seek equitable relief, damages and injunctive relief pursuant to:

a) Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

b) California Business and Professions Code § 17200;

119. **Persons Excluded From The Class:** Specifically excluded from the proposed Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

120.  **Numerosity:** The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains tens of thousands of members. The precise number of Class Members is unknown to Plaintiffs. The true number of Class Members is known by Defendant Google and is discernible from Google's records.

121.  **Commonality:** Federal Rules of Civil Procedure 23(a)(2) and Rule 23(b)(3) are satisfied because there are questions of law and fact common to Plaintiffs and the Class, which common questions predominate over any individual questions affecting only individual members, the common questions of law and fact include, but are not limited to:

a)  What was the extent of Defendant's business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' personal information including, but not limited to, UUIDs and geolocation?

b)  What information did Defendant's collect from their business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' personal information including, but not limited to, UUIDs and geolocation, and what did they do with that information?

c)  Whether users, by virtue of downloading applications, had pre-consented to the operation of Defendant's business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' UUIDs and other personal information;

d)  Was there adequate notice, or *any* notice, provided to Plaintiffs and Class Members of the operation of Defendant's business practices of transmitting, accessing, collecting, monitoring, sharing and remotely storing users' personal information including, but not limited to, UUIDs and geolocation and the sharing of this data with third parties?

e)  Was there reasonable opportunity provided to Plaintiffs and Class Members to decline the operation of Defendant's business practices of

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   transmitting, accessing, collecting, monitoring, sharing and remotely

2   storing users' personal information including, but not limited to, UUIDs

3   and geolocation?

4   f)   Did Defendant's business practices of obtaining, collecting, monitoring,

5   sharing and remotely storing users' UUIDs, and other personal

6   information, disclose, intercept, and transmit personally identifying

7   information, or sensitive identifying information, or personal information

8   in violation of state and federal law?

9   g)   Whether Defendant devised and deployed a scheme or artifice to defraud

10   or conceal from Plaintiffs and the Class Members Defendant's ability to,

11   and practice of, intercepting, accessing, sharing and manipulating, for its

12   own benefit, personal information, and tracking data from Plaintiffs' and

13   the Class Members' personal mobile devices?

14   h)   Whether Defendant engaged in deceptive acts and practices in connection

15   with their undisclosed and systemic practice of transmitting, accessing

16   and/or disclosing unique identifiers, tracking data, and personal

17   information on Plaintiffs' and the Class Members' personal mobile

18   devices and used that data to track and profile Plaintiffs' and the Class

19   Members' Internet activities and personal habits, proclivities, tendencies,

20   and preferences for Defendant's use and benefit?

21   i)   Did Defendant's business practices of transmitting, accessing, collecting,

22   monitoring, sharing and remotely storing users' data violate the Computer

23   Fraud and Abuse Act, 18 U.S.C. § 1030?

24   j)   Did Defendant's business practices of transmitting, accessing, collecting,

25   monitoring, sharing and remotely storing users' UUIDs violate

26   California's Business and Professions Code § 17200?

27

28

k) Whether Plaintiffs and Class Members have sustained damages as a result of Defendant's conduct, and, if so, what is the appropriate measure of damages?

l) Whether Plaintiffs and Class Members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein?

m) Whether Plaintiffs and Class Members are entitled to punitive damages, and, if so, in what amount?

122. **Typicality:** Plaintiffs' claims are typical of the claims of all of the other members of the Class, because their claims are based on the same legal and remedial theories as the claims of the Class and arise from the same course of conduct by Defendant.

123. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in consumer class action litigation. Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

124. **Superiority:** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against the Defendant. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them.

125. In the alternative, the Class may also be certified because:

a) the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members that would establish incompatible standards of conduct for the Defendant;

b) the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c) Defendant acted or refused to act on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## VII. CLAIMS FOR RELIEF

126.    Based on the foregoing allegations, Plaintiffs' claims for relief include the following:

### FIRST CLAIM FOR RELIEF
### Violation of the Computer Fraud and Abuse Act 18 U.S.C § 1030, *et seq.*

127.    Plaintiffs incorporate the foregoing by reference as if fully set forth herein.

128.    The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, referred to as "CFAA," regulates fraud and related activity in connection with computers.

129.    The CFAA makes it unlawful to intentionally access a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, thereby obtaining information from such a protected computer, within the meaning of 18 U.S.C. § 1030(a)(2)(C).

130.    Each of Plaintiffs and Class Members' mobile devices on which the AOS is installed is a "protected computer ... which is used in interstate commerce and/or communication" within the meaning of 18 U.S.C. § 1030(e)(2)(B).

131.    Defendant violated 18 U.S.C. 1030 by intentionally accessing Plaintiffs' and Class Members' mobile devices without authorization or by exceeding authorization, thereby obtaining information from such a protected computer.

132.    The CFAA, 18 U.S.C. § 1030(g) provides a civil cause of action to "any person who suffers damage or loss by reason of a violation of CFAA."

133.    The CFAA, 18 U.S.C. § 1030(a)(5)(A)(i) makes it unlawful to "knowingly cause the transmission of a program, information, code, or command and as a result of such conduct, intentionally cause damage without authorization, to a protected computer," of a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

134.    Upon information and belief, Defendant's violation of the CFAA resulted in greater than $5,000 in aggregate damages.

135.    By collecting and transmitting data, Defendant used or allowed the use of a finite amount of Plaintiffs and Class Members data plans. Mobile phone users, including Plaintiffs and

Class Members, pay for a set amount of data each month. For example, AT&T's current data plans are 300MB/month for $20; 3GB/month for $30; and 5GB/month for $50. Once that data amount is reached users must pay overage charges. For example on most AT&T and Verizon plans it is $15 per 1 gigabyte of data over the plan amount.

136.    Any amount of data used has value given that Plaintiffs and Class Members pay for their data plans.

137.    Thus Defendant's conduct has damaged Plaintiffs and Members of the Class first by using a portion of the available data in their data plans and second by potentially exposing them to data overage charges.

138.    Given the number of Android users and the amount of data, on information and belief the damages are greater than $5,000.

139.    Defendant violated the CFAA because the Android operating system and associated APIs knowingly allowed the transmission of code or commands, and/or Defendant surreptitiously embedded tracking code unrelated to the advertised functioning of an App, to Plaintiffs and Class Members' mobile devices, which code or commands accessed the Personal Information of Plaintiffs' and Class Members and transmitted such information to Defendant and other third parties, without the knowledge, consent or authorization of Plaintiffs.

140.    Defendant violated 18 U.S.C. § 1030(a)(5)(A)(i) by knowingly causing the transmission of a command to be downloaded to Plaintiffs' and Class Members' mobile devices, which are protected computers as defined above, and intentionally causing damage without authorization.

141.    Defendant violated 18 U.S.C. § 1030(a)(5)(A)(ii) by intentionally accessing Plaintiffs' and Class Members' protected mobile devices without authorization, and as a result of such conduct, recklessly caused damage to Plaintiffs' and Class Members' mobile devices by impairing the integrity of data and/or system and/or information.

142.    Defendant violated 18 U.S.C. § 1030 (a)(5)(A)(iii) by intentionally accessing Plaintiffs' and Class Members' protected computers without authorization, and as a result of such conduct, caused damage and loss to Plaintiffs and Class Members.

143. Defendant intended to cause damage in that they knew or should have known that their conduct would consume Plaintiffs' and Class Members' valuable computer assets and resources, as described more fully in Section entitled "Improper Resource Utilization" above.

144. Defendant intended to access Plaintiffs' and Class Members' Personal Information, inasmuch as such access was accomplished through the execution of computer code and instructions specifically designed for such access, such as App code created using SDKs provided by AdMob and AdWhirl, which effectuated access to Plaintiffs' and Class Members' computers by interacting with Google-provided APIs (application programming interfaces) specifically designed by Google to facilitate the retrieval of information from mobile devices.

145. Defendant's conduct was without authorization and/or exceeded authorization.

146. Plaintiffs and Class Members suffered damage by reason of these violations, as defined in 18 U.S.C. 1030(e)(8), by the "impairment to the integrity or availability of data, a program, a system or information," in that Defendant's conduct caused the condition, value and functionality of Plaintiffs and Class Members' mobile devices and their related computer resources to be impaired.

147. Plaintiffs and Class Members have suffered loss by reason of these violations, as defined in 18 U.S.C. 1030(e)(11), by the "reasonable cost . . . including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." As described more fully above in the Section entitled "Harms Suffered," as a result of Defendant's conduct, Plaintiffs and Class Members suffered costs incurred due to Defendant's utilization of their valuable computer resources, the diminution in value of their mobile devices, and the deprivation of the value of their information assets.

148. Defendant's unlawful access to Plaintiff and Class Members' computers, use of their computer assets and resources, interruption of their services, and taking of their information was carried out through the same automated process, and resulted in an aggregated loss to Plaintiffs and Class Members of at least $5,000 within a one-year period.

149.    The aggregated losses to Plaintiff and Class Members amount to $5,000 or greater during a one-year period in that the battery life consumed by Defendant, and the concomitant diminution in the value of the mobile devices, can be discerned through discovery of Defendant's records and expert testimony. The Class consists of millions of individuals whose losses are a function of repeated, battery-affecting App events. When losses are aggregated across Plaintiffs and millions of Class Members, losses exceed $5,000 during any one-year period.

150.    Defendant's unlawful access to Plaintiffs' and Class Members' computers and electronic communications has caused Plaintiffs and Class Members irreparable injury. Unless restrained and enjoined, Defendant will continue to commit such acts. Plaintiffs' and Class Members' remedy at law is not adequate to compensate them for these inflicted and threatened injuries, entitling Plaintiff and Class Members to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

151.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and Class Members have suffered harm and are entitled to appropriate relief pursuant to 18 U.S.C. § 1030.

## SECOND CLAIM FOR RELIEF
### Violation of California Business and Professions Code § 17200, *et seq.*

152.    Plaintiffs incorporate by reference all paragraphs previously alleged herein.

153.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

154.    Defendant's acts and practices as detailed herein constitute acts of unfair competition. Defendant has engaged in unlawful, unfair or fraudulent business acts and/or practices within the meaning of California Business & Professions Code, Section 17200, *et seq.* Defendant need only violate one of the three prongs to be held strictly liable.

155.    Defendant's unfair or deceptive practices occurred primarily and substantially in California. Decisions concerning the retention, safeguarding and disclosure of user information were made in California as Defendant Google maintains all or a substantial part of its computer

systems containing user information in California, and the disclosure of its users' information took place primarily and substantially in California.

156.    Plaintiffs have standing to bring claims under the UCL because they lost money and/or property because they paid more than they otherwise would have for their phones, lost available data on their data plans, and suffered diminished battery life.

**A.    Unlawful Business Acts and Practices**

157.    Defendant violated the "unlawful" prong of the UCL in that Defendant's conduct violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; the 2011 consent order Google entered into with the United States Federal Trade Commission; and other laws and statutes. As a result, these claims may serve as predicate violations of the "unlawful" prong of the UCL.

158.    Plaintiffs reserve the right to identify additional provisions of the law violated by Defendant as further investigation and discovery warrants.

**B.    Unfair Business Acts and Practices**

159.    Defendant violated the "unfair" prong of the UCL by improperly capturing, storing, and transmitting Plaintiffs and Class Members' Personal Information in unencrypted form, without Plaintiffs and Class Members' knowledge and consent.

160.    Defendant's acts and practices are unfair because they have caused harms as fully described in the section entitled, "Harms Suffered," which includes the devaluation of Plaintiffs' and Class Members' personal property and the diminishing of battery life resources.

161.    Plaintiffs have suffered material disadvantage regarding their interests in the privacy, confidentiality, and security of their Personal Information, in which they have a property interest, and have lost money, including the difference between what they paid for their mobile devices and the devaluation of their mobile devices as a result of Defendant's privacy-invading and resource-consuming functions.

**C.    Fraudulent**

162.    Defendant violated the "fraudulent" prong of the UCL by explicitly representing in its privacy agreement that it would not provide users' personal information to third parties without consent and omitting that such information could be accessed by third parties.

Defendant used this misrepresentation to induce users to purchase the Android devices and Apps offered in the Android Market. Defendant then knowingly transmitted that information to third parties without authorization and allowed Developers and Developer Affiliates to access such information.

163.    Defendant's unfair or deceptive practices occurred primarily and substantially in California. Decisions concerning the retention and safeguarding of the disclosure of user information were made in California, Defendant maintains all or a substantial part of its computer systems containing user information in California, and the disclosure of its users' information took place primarily and substantially in California.

164.    Google had a duty to fully disclose the privacy and security characteristics of the mobile devices and operation with the Apps sold in the Google Android Market because it (i) knew or should have known about such characteristics at the time that Plaintiffs and members of the Class purchased the product, inasmuch as Google designed the Android operating system and created the Android App Market to promote third-party tracking and continued to upgrade its operating system in ways that maintain the ability of third-party trackers to continue their unauthorized tracking and interception of electronic communications; (ii) had exclusive knowledge of these material facts, which information was not known to Plaintiffs; and (iii) made a partial representation regarding Plaintiffs' and Class Members' ability to opt-in or consent to location tracking services and anonymization of such data but failed to disclose that users are tracked by their UUID's and usage of Apps, often linked to other identifiers unique to Plaintiffs and Class members, regardless of the use of the privacy, location and security tools on their mobile devices, and that this information is tied to their mobile devices in such a way that the information is not "anonymized" at all.

165.    Further, Google failed to fully disclose the material facts that the Android App Market, the Apps, and Google's relationships with App developers and their Affiliates was designed to foster the unauthorized taking of and profiting from Plaintiffs' and Class Members' Personal Information.

166.    As a proximate and/or direct result of the unlawful, unfair, and fraudulent

business practices of Defendant, Plaintiffs and the Class have suffered injury-in-fact and have lost money and property.

167. Pursuant to section 17203 of the California Business and Professions Code, Plaintiffs, on their own behalf and on behalf of the Class, seek restitution and a Court order enjoining Defendant from such future conduct and any other such orders that may be necessary to rectify the unlawful, unfair, and fraudulent business practices of Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendant as follows:

A. Certify this case as a class action on behalf of the Class defined above, appoint Plaintiffs as Class representatives, and appoint their counsel as Class counsel;

B. Declare that the actions of Defendant, as set out above, violate the law as set forth in the Claims herein;

C. Award injunctive and equitable relief including, *inter alia*: (i) prohibiting Defendant from engaging in the acts alleged above; (ii) requiring Defendant to disgorge all of its ill-gotten gains to Plaintiffs and the other Class Members, or to whomever the Court deems appropriate; (iii) requiring Defendant to delete all data surreptitiously or otherwise collected through the acts alleged above; (iv) requiring Defendant to provide Plaintiffs and the other Class Members a means to easily and permanently decline any participation in any data collection activities; (v) awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendant by means of the wrongful conduct alleged herein; and (vi) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendant;

D. Award damages, including statutory damages where applicable, to Plaintiffs and Class Members in an amount to be determined at trial;

E. Award restitution against Defendant for all money to which Plaintiffs and the

1    Class are entitled in equity;

2         F.     Restrain Defendant from continued access, collection, and transmission of

3    Plaintiffs' and Class Members' personal information via preliminary and permanent injunction;

4         G.     Award Plaintiffs and the Class:

5              a.   compensatory damages sustained by Plaintiffs and all others similarly situated as
                    a result of Defendant's unlawful acts and conduct;
6

7              b.   restitution, disgorgement and/or other equitable relief as the Court deems proper;

8              c.   their reasonable litigation expenses and attorneys' fees;

9              d.   pre- and post-judgment interest, to the extent allowable;

10             e.   statutory damages, including punitive damages; and

11             f.   permanent injunction prohibiting Defendant from engaging in the conduct and
                    practices complained of herein.
12

13        H.     For such other and further relief as this Court may deem just and proper.

14   Dated May 9, 2013                      AUDET & PARTNERS, LLP

15                                            /s/ Jonas P. Mann
                                            William M. Audet (CA State Bar #117456)
16                                          Jonas P. Mann (CA State Bar #263314)
                                            221 Main Street, Suite 1460
17                                          San Francisco, CA 94105
                                            Telephone: (415) 568-2555
18                                          Facsimile: (415) 568-2556
                                            Email:    waudet@audetlaw.com
19                                          Email:    jmann@audetlaw.com
20
                                            *Interim Class Counsel*
21
                                            Robert K. Shelquist
22                                          Karen Hanson Riebel
                                            LOCKRIDGE GRINDAL NAUEN PLLP
23                                          100 Washington Avenue South
                                            Suite 2200
24                                          Minneapolis, MN 55401
                                            Telephone:(612) 339-6900
25                                          Facsimile: (612) 339-0981
                                            Email:    rkshelquist@locklaw.com
26                                          Email:    khriebel@locklaw.com

27

28

Joseph H. Malley
LAW OFFICE OF JOSEPH H. MALLEY, PC
1045 North Zang Boulevard
Dallas, TX 75208
Telephone: (214) 943-6100
Email:      malleylaw@gmail.com

Salim Khawaja
LAW OFFICE OF SALIM KHAWAJA
1010 Second Avenue
Suite 1750
San Diego, CA 92101
Telephone: (619) 685-5300
Facsimile: (619) 685-5344
Email:      salimklaw@hotmail.com

Steven T. Budaj
Donald J. Andrews, II
Paul M. Hughes
STEVEN T. BUDAJ, P.C.
65 Cadillac Square
Suite 2915
Detroit, MI 48226
Telephone: (313) 963-9330
Facsimile: (313) 963-9185
Email:      stbudaj@counsel.cc
Email:      j.andrews2@excite.com
Email:      paul@attorneyhughes.com

Sara Dawn Avila
Gillian Leigh Wade
MILSTEIN ADELMAN, LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405
Telephone: (310) 396-9600
Facsimile: (310) 396-935
Email:      savila@milsteinadelman.com
Email:      gwade@milsteinadelman.com

Howard W. Rubinstein
Benjamin Lopatin
THE LAW OFFICES OF HOWARD W. RUBINSTEIN
P.O. Box 4839
Aspen, CO 81612
Telephone: (832) 715-2788
Facsimile: (561) 688-0630
Email:      howardr@pdq.net
Email:      blopatin@gmail.com

Richard A. Proaps, Esq.
Cal. State Bar Number:  78898
8150 Greenback Lane
Building 200
Fair Oaks, CA 95628
Tel:              (916) 722-1665
Fax:             (916) 722-4881
Email:      rproaps@aol.com

Aaron C. Mayer
MAYER LAW GROUP
18 Carolina Street
Suite B
Charleston, SC 29403
Telephone: (843) 376-4929
Facsimile: (888) 446-3963
Email:      aaron@mayerlawgroup.com

Nabil Majed Nachawati, II
FEARS NACHAWATI LAW FIRM
4925 Greenville Avenue
Suite 715
Dallas, TX 75206
Telephone: (214) 890-0711
Facsimile: (214) 890-0712
Email:      mn@fnlawfirm.com

Donald Amamgbo
AMAMGBO & ASSOCIATES
6167 Bristol Parkway, #325
Culver City, CA 90230
Telephone: (310) 337-1137
Facsimile: (310) 337-1157
Email:      donald@amamgbolaw.com

Reginald Terrell
THE TERRELL LAW GROUP
Post Office Box 13315, PMB #148
Oakland, CA 94661
Telephone: (510) 237-9700
Facsimile: (510) 237-4616
Email:      reggiet2@aol.com

E. Kirk Wood
WOOD LAW FIRM, LLC
P.O. Box 382434
Birmingham, AL 35238-2434
Telephone: (205) 612-0243
Facsimile: (866) 747-3905
Email:      ekirkwood1@bellsouth.net

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joe R. Whatley, Jr.
Whatley, Drake, & Kallas
2001 Park Place North
Suite 1000
Birmingham, AL 35203
Telephone:(205) 328-9576
Facsimile: (205) 328-9669
Email:     jwhatley@wdklaw.com

Jeremy Reade Wilson
WILSON TROSCLAIR & LOVINS
302 North Market Street
Suite 501
Dallas, TX 75202
Telephone:(214) 430-1930
Facsimile: (214) 276-1475
Email:     jeremy@wtlfirm.com

Brian W. Smith
SMITH & VANTURE, LLP
1615 Forum Place, Suite 4C
West Palm Beach, FL 33401
Telephone:(561) 684-6330
Facsimile: (561) 688-0630
Email:     bws@smithvanture.com

*Attorneys for Plaintiffs*

1

**JURY TRIAL DEMAND**

2

Plaintiffs hereby demand a trial by jury of all issues so triable.

3

4

Dated May 9, 2013                    AUDET & PARTNERS, LLP

5

    /s/ Jonas P. Mann
William M. Audet (CA State Bar #117456)

6

Jonas P. Mann (CA State Bar #263314)
AUDET & PARTNERS, LLP

7

221 Main Street, Suite 1460

8

San Francisco, CA 94105
Telephone: (415) 568-2555

9

Facsimile: (415) 568-2556
Email:     waudet@audetlaw.com

10

        jmann@audetlaw.com

11

*Interim Class Counsel*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Jonas P. Mann, an attorney, hereby certify that on May 9, 2013, I caused the above *Second Amended Consolidated Class Action Complaint*, to be served by causing true and accurate copies of such documents to be electronically filed and transmitted to counsel of record through the Court's CM/ECF electronic filing system.


Date:   May 9, 2013                    Respectfully submitted,

                                       AUDET & PARTNERS, LLP

                                       _____/s/ Jonas P. Mann_____
                                       William M. Audet (CA State Bar #117456)
                                       Jonas P. Mann (CA State Bar #263314)
                                       AUDET & PARTNERS, LLP
                                       221 Main Street, Suite 1460
                                       San Francisco, CA 94105
                                       Telephone: (415) 568-2555
                                       Facsimile: (415) 568-2556
                                       Email:        waudet@audetlaw.com
                                                     jmann@audetlaw.com

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT